**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1320

BRYAN MANNING; RYAN WILLIAMS; RICHARD DECKERHOFF; RICHARD EUGENE WALLS,

Plaintiffs - Appellants,

v.

DONALD CALDWELL, Commonwealth's Attorney for the City of Roanoke; MICHAEL NEHEMIAH HERRING, Commonwealth's Attorney for the City of Richmond,

Defendants - Appellees.

----------------------------------------

NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Glen E. Conrad, District Judge.  (7:16-cv-00095-GEC)

Argued:  January 30, 2019                    Decided:  July 16, 2019

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges, and DUNCAN, Senior Circuit Judge.

Reversed and remanded by published opinion.  Judges Motz and Keenan wrote the majority opinion, in which Chief Judge Gregory, and Judges King, Wynn, Floyd,

Thacker, and Harris joined. Judge Keenan wrote a concurring opinion, in which Judges Motz and Thacker joined. Judge Wilkinson wrote a dissenting opinion, in which Judges Niemeyer, Agee, Richardson, Quattlebaum, and Senior Judge Duncan joined. Judge Wilkinson wrote a specially dissenting opinion. Judge Diaz wrote a dissenting opinion.

———————

**ARGUED:** Jonathan Lee Marcus, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Washington, D.C., for Appellants. Matthew Robert McGuire, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Mark D. Young, Maureen A. Donley, Donald P. Salzman, Theodore M. Kneller, Shekida A. Smith, Daniel B. O'Connell, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Washington, D.C.; Mary Frances Charlton, Angela Ciolfi, Elaine Poon, LEGAL AID JUSTICE CENTER, Charlottesville, Virginia, for Appellants. Mark R. Herring, Attorney General, Trevor S. Cox, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees. Eric S. Tars, NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY, Washington, D.C.; Richard P. Bress, Andrew D. Prins, George C. Chipev, Ryan C. Grover, LATHAM & WATKINS LLP, Washington, D.C.; Douglas N. Letter, Nicolas Y. Riley, Seth Wayne, Institute for Constitutional Advocacy and Protection, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Amicus Curiae.

———————

DIANA GRIBBON MOTZ and BARBARA MILANO KEENAN, Circuit Judges, with whom Chief Judge GREGORY, and Judges KING, WYNN, FLOYD, THACKER and HARRIS join:

Homeless alcoholics brought this action challenging a Virginia statutory scheme that makes it a criminal offense for those whom the Commonwealth has labelled "habitual drunkards" to possess, consume, or purchase alcohol. The scheme authorizes Virginia to obtain, in absentia, a civil interdiction order against persons it deems "habitual drunkards," and then permits Virginia to rely on the interdiction order to criminally prosecute conduct permitted for all others of legal drinking age. Plaintiffs allege that this scheme, which has resulted in their repeated arrest and imprisonment, violates the Constitution. The district court dismissed their complaint, holding that they failed to state a claim upon which relief could be granted. After a panel of this Court affirmed, we agreed to rehear the case en banc. For the reasons that follow, we now reverse.

I.

Because the district court dismissed Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6), we accept as true the factual allegations set forth in the complaint and draw all reasonable inferences in their favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A.

The challenged policy rests on a series of interrelated statutes that operate as a single scheme. Virginia Code § 4.1-333(A) permits a Virginia circuit court to enter a

3

civil interdiction order "prohibiting the sale of alcoholic beverages . . . until further ordered" to a person who "has been convicted of driving . . . while intoxicated or has shown himself to be an habitual drunkard." The Virginia statutory scheme does not include a definition of the term "habitual drunkard," nor does it set forth any elements or standards governing the determination whether a defendant qualifies as an "habitual drunkard." Va. Code § 4.1-333. Instead, it relegates those matters "to the satisfaction of the circuit court." *Id.* And although Virginia Code § 4.1-333 requires that any individual potentially subject to interdiction be permitted a "hearing upon due notice," the record shows that such hearings often are conducted without the defendant being present.

Once declared an "habitual drunkard," an interdicted person is subject to incarceration for the mere possession of or attempt to possess alcohol, or for being drunk in public. Virginia Code § 4.1-322 establishes a Class 1 misdemeanor for an interdicted person to "possess any alcoholic beverages," or to be "drunk in public" in violation of Virginia Code § 18.2-388. Similarly, Virginia Code § 4.1-305 establishes a Class 1 misdemeanor prohibiting an interdicted person from "consum[ing], purchas[ing], or possess[ing], or attempt[ing] to consume, purchase or possess, any alcoholic beverage," except in certain statutorily exempt circumstances, such as the use of medicines containing alcohol.[1] The punishment for these crimes is "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." Va. Code

---

[1] Plaintiffs do not challenge the constitutionality of the portion of the Virginia scheme addressing driving while intoxicated. When bringing a constitutional challenge, a party may contest certain parts of a statute without challenging the whole of the statute. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 862–63 (1997).

4

§ 18.2-11(a).  Individuals who have not been interdicted are subject only to a "fine of not more than $250" for public intoxication.  *See* Va. Code §§ 18.2-388, 18.2-11(d).

B.

Each of the named Plaintiffs in this case, Bryan Manning, Ryan Williams, Richard Deckerhoff, and Richard Eugene Walls, alleges that he has been interdicted as an "habitual drunkard" pursuant to this statutory scheme.  Each alleges that he suffers from alcohol use disorder, commonly called alcoholism, which causes him a "profound drive or craving to use alcohol" that is "compulsive or non-volitional."  Each further alleges that he is homeless and that his homelessness exacerbates his addiction, "mak[ing] it nearly impossible . . . to cease or mitigate alcohol consumption."  Notably, however, nothing in the complaint or elsewhere in the record indicates that any Plaintiff was convicted of any alcohol-related offenses before being interdicted.[2]

Plaintiffs allege that, although by its terms the challenged scheme is not limited to the homeless, in practice it functions as a tool to rid the streets of particularly vulnerable, unwanted alcoholics like themselves.  In support of this claim, they allege that although there were 4,743 prosecutions for the crime of "possession or consumption of alcoholic beverages by interdicted persons" during the decade preceding 2015, only 1,220 distinct individuals were interdicted between 2007 and 2015.

---

[2] Although the civil orders of interdiction for Manning and Williams state that certified abstracts or copies of convictions were submitted to the state court as part of the interdiction proceedings, the record does not show the offense underlying those convictions, nor does the record reveal how many times Manning or Williams had been convicted before being interdicted.  The record does not contain the interdiction orders for Deckerhoff or Walls.

5

Each of the named Plaintiffs asserts that he has been repeatedly criminally prosecuted after interdiction, often on dubious grounds. Some say they have been prosecuted as many as 25 to 30 times. In each instance, Plaintiffs faced (and allege they will again face) arrest, prosecution, and incarceration for up to a year in prison, all for conduct permitted for all others of legal drinking age. They allege that the "habitual drunkard" label also has adversely affected their ability to maintain employment and secure long-term housing, and has subjected them to continual harassment and embarrassment.[3]

C.

In March 2016, the named Plaintiffs filed this putative class action alleging that the Virginia scheme (1) constituted cruel and unusual punishment outlawed by the Eighth Amendment, (2) deprived them of due process of the law in violation of the Fourteenth Amendment, (3) denied them the equal protection guarantees of the Fourteenth Amendment, and (4) was unconstitutionally vague in violation of the Fourteenth

---

[3] The challenged Virginia scheme dates to the late nineteenth century. *See* Va. Code Ch. 83 § 5 (1873). Then, it had a rehabilitative purpose. A family member or friend could file a written complaint asserting that a person was "an habitual drunkard," which authorized a justice of the peace to issue a warrant ordering a hearing. *Id.* If three justices of the peace found, in consultation with a physician, that home confinement would "possibly restore" the person "to sobriety and self-control," they could impose home confinement. *Id.* The law permitted a person so confined to demand a jury trial as to his condition at any time after an order was sought. *Id.*; *see also* Maria Slater, Note, *Is* Powell *Still Valid? The Supreme Court's Changing Stance on Cruel and Unusual Punishment*, 104 Va. L. Rev. 547, 582–83 (2018). In 1934, Virginia abandoned this rehabilitative approach and adopted the punitive scheme that it retains today.

Amendment.  The district court considered and rejected all four claims and so dismissed the complaint.

In rejecting Plaintiffs' vagueness and Eighth Amendment claims, the district court relied largely on a 1979 district court opinion, which this Court summarily affirmed. *Fisher v. Coleman*, 486 F. Supp. 311 (W.D. Va. 1979), *aff'd*, 639 F.2d 191 (4th Cir. 1981) (per curiam).  After a panel of this Court affirmed the district court in this case, we voted to rehear the case en banc, and so vacated the panel opinion.  *See Manning v. Caldwell*, 900 F.3d 139 (4th Cir.), *reh'g en banc granted*, 741 F. App'x 937 (4th Cir. 2018).

We now consider the case anew, reviewing de novo the district court's grant of a motion to dismiss for failure to state a claim.  *Stewart v. Iancu*, 912 F.3d 693, 702 (4th Cir. 2019).[4]  We hold that the challenged scheme is unconstitutionally vague, and that

---

[4] The Commonwealth poses several preliminary challenges to our jurisdiction — namely, the *Rooker-Feldman* doctrine and asserted lack of standing and ripeness.  The panel correctly and unanimously, albeit *sub silentio*, rejected all of these challenges.  The *Rooker-Feldman* doctrine provides no bar because Plaintiffs do not seek redress for an injury caused by a state court judgment.  *See Thana v. Bd. of License Comm'rs for Charles Cty.*, 827 F.3d 314, 318–20 (4th Cir. 2016); *see also Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of App. v. Feldman*, 460 U.S. 462 (1983).  That is, Plaintiffs do not challenge their specific *interdiction orders*; they challenge only the Virginia scheme's *application* to them in the *future*.  Nor do standing and ripeness doctrines pose obstacles to Plaintiffs' suit.  Plaintiffs allege that they have been repeatedly arrested, charged, and prosecuted with violating Virginia Code § 4.1-322.  They further allege that because they are homeless, their possession and consumption of alcohol is necessarily in the public view.  Plaintiffs have thus plausibly alleged a real and immediate threat of future injury.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–07 (1983).

even if it could be narrowed to apply only to similarly situated alcoholics, Plaintiffs have stated a claim that it violates the Eighth Amendment as applied to them.[5]

## II.

We first consider Plaintiffs' vagueness challenge.

## A.

Before reaching the merits of that challenge, we must address the question whether this issue is properly before the en banc Court. Although the question of vagueness was fully litigated and decided in the district court, Plaintiffs expressly declined to "press this claim" before the original three-judge panel. Thus, the Commonwealth now contends that the issue has been waived before the en banc Court.[6]

Mindful of our role as a neutral arbiter, this Court typically does not "ventur[e] beyond the confines of the case on appeal to address arguments the parties have deemed unworthy of orderly mention." *United States v. Holness*, 706 F.3d 579, 591–92 (4th Cir. 2013). Nonetheless, "[t]he matter of what questions may be taken up and resolved for the

---

[5] For the reasons set forth in the panel opinion, Plaintiffs' other claims fail. *See Manning*, 900 F.3d at 151–53.

[6] The Commonwealth frames Plaintiffs' decision as a "waiver," which is the "intentional relinquishment . . . of a known right" that leaves no error for the Court to review. *See United States v. Olano*, 507 U.S. 725, 733 (1993). However, we recently explained that "waiver, in a technical sense, concerns a party's relinquishment of rights before a *district court*." *United States v. Simms*, 914 F.3d 229, 238 n.4 (4th Cir. 2019) (en banc). Because Plaintiffs properly raised and litigated their vagueness claim before the district court, their decision not to advance that argument on appeal is better treated as abandonment or forfeiture, pursuant to which we retain the discretion to review the particular issue in question. *See id.*

8

first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

We regularly exercise our discretion to excuse a party's abandonment of an issue when the record provides an adequate basis to consider an alternative legal theory and when neither party is prejudiced by such consideration. *See, e.g.*, *Simms*, 914 F.3d at 238; *Holness*, 706 F.3d at 592; *United States v. Ramos-Cruz*, 667 F.3d 487, 496 n.5 (4th Cir. 2012); *Rice v. Rivera*, 617 F.3d 802, 808 n.4 (4th Cir. 2010); *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 369 (4th Cir. 2008). Indeed, we have recognized that when "deemed necessary to reach the correct result" on matters of public importance, we may "*sua sponte* consider points not presented to the district court *and not even raised on appeal by any party.*" *Wash. Gas Light Co. v. Va. Elec. & Power Co.*, 438 F.2d 248, 251 (4th Cir. 1971) (second emphasis added); *see also Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ("Rules of practice and procedure are devised to promote the ends of justice, not to defeat them."); *Curry v. Beatrice Pocahontas Coal Co.*, 67 F.3d 517, 522 n.8 (4th Cir. 1995) ("The normal rule of course is that failure to raise an issue for review in the prescribed manner constitutes a waiver. But the rule is not an absolute one and review may proceed (even completely *sua sponte*) when the equities require." (internal citation omitted)).

We considered an abandoned issue less than a year ago in *United States v. Simms*, 914 F.3d 229. In that case, the en banc Court addressed whether 18 U.S.C. § 924(c)(3)(B) was susceptible to a conduct-specific approach, notwithstanding that the government had expressly abandoned that argument before the original three-judge panel.

*See id.* at 237–39.[7]   Given the "exceptional importance" of the question presented, in *Simms* every member of the Court, the majority and the dissenters alike, unanimously agreed to consider the merits of the government's abandoned arguments.  *See id.* at 239–52; *see also id.* at 253–60 (Wynn, J., concurring); *id.* at 260–63 (Wilkinson, J., dissenting); *id.* at 264–72 (Niemeyer, J., dissenting); *id.* at 272–80 (Richardson, J., dissenting).

The circumstances before us here merit a similar exercise of discretion.  As noted above, the issue of vagueness was litigated fully and was decided in the district court.  And the question of a statute's vagueness is a purely legal issue that does not require additional fact-finding.  *See United States v. Picardi*, 739 F.3d 1118, 1126 (8th Cir. 2014); *United States v. Paradies*, 98 F.3d 1266, 1284 (11th Cir. 1996); *United States v. Mallas*, 762 F.2d 361, 364 n.4 (4th Cir. 1985).   Thus, the present record "readily permit[s] evaluation" of Plaintiffs' vagueness theory.  *Holness*, 706 F.3d at 592.

Additionally, neither party will be prejudiced by consideration of the vagueness issue.  Both parties were questioned about the vagueness of the statutory scheme during oral argument before the en banc Court, and both submitted supplemental briefs on the subject.   Moreover, the crux of Plaintiffs' appeal concerns an issue of "exceptional importance" to the Commonwealth of Virginia, namely, whether a statutory scheme

---

[7] Thus, Plaintiffs' failure to raise their vagueness claim before the original three-judge panel in this case clearly does not preclude the en banc Court from considering the issue.  The grant of rehearing en banc vacated the original panel opinion.  *See* 4th Cir. Local R. 35(c).  And, as we concluded in *Simms*, 914 F.3d at 237–39, it is well within the authority of the en banc Court to decide a case on grounds not relied upon, or even considered, by the original panel.

imposing criminal penalties on an untold number of chronically ill citizens is unconstitutionally vague. Accordingly, we are persuaded that there are compelling reasons in this case to justify excusing Plaintiffs' initial abandonment of their vagueness claim on appeal.

B.

1.

The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments. *See Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016). To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 160 (1972); *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (requiring that criminal statutes contain "minimal guidelines to govern law enforcement" (citation omitted)).

This test is not applied mechanically. The degree of vagueness tolerated in a law depends in part on the type of statute. Less clarity is required in purely civil statutes because the "consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). *But see Sessions v. Dimaya*, 138 S. Ct. 1204, 1225–31 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (noting that "today's civil laws regularly impose penalties far more severe than those found in many criminal statutes"). However, if criminal penalties may be imposed for violations of a law, a stricter standard is applied in reviewing the statute

11

for vagueness. *Hoffman*, 455 U.S. at 498–99. Similarly, the void-for-vagueness doctrine applies to "laws that fix the permissible sentences for criminal offenses." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017); *accord Cross v. United States*, 892 F.3d 288, 304–06 (7th Cir. 2018). And even laws that nominally impose only civil consequences warrant a "relatively strict test" for vagueness if the law is "quasi-criminal" and has a stigmatizing effect. *Hoffman*, 455 U.S. at 498–500; *see also Dimaya*, 138 S. Ct. at 1212–13 (applying the most exacting vagueness standard to a civil statute authorizing a respondent's removal from the United States).

In this case, the challenged Virginia scheme plainly has criminal consequences. An individual adjudicated to be an "habitual drunkard" faces an enhanced penalty for public intoxication. *Compare* Va. Code § 4.1-322, *with id.* § 18.2-388. And, unlike all others of legal drinking age, interdicted persons commit a crime punishable by up to twelve months' incarceration merely for possessing alcohol. *See id.* §§ 4.1-305; -322. Because the interrelated provisions operate together to "fix the permissible sentences" for those labelled "habitual drunkards," the statutes, at a minimum, are quasi-criminal in nature. *Beckles*, 137 S. Ct. at 892; *Hoffman*, 455 U.S. at 498–500.

The integrated structure of the challenged scheme reinforces this conclusion. "[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *In re Consol. Freightways Corp. of Del.*, 564 F.3d 1161, 1165 (9th Cir. 2009) (recognizing that courts must "construe th[e] provision [at issue] with the statutory scheme in which it is embedded"). A civil interdiction order issued under Virginia Code

12

§ 4.1-333 is a necessary predicate for imposing the increased criminal penalties set forth in the other statutes addressing interdiction. Indeed, such an interdiction order would be meaningless without the conditions and criminal consequences that follow from a violation of that order. And although the portions of the scheme that impose those conditions and consequences do not use the term "habitual drunkard," that term is incorporated by reference. *See, e.g.*, Va. Code §§ 4.1-304 (prohibiting the sale of alcoholic beverages to "interdicted person"), 4.1-322 (prohibiting "person[s] who [have] been interdicted pursuant to § 4.1-333" from possessing alcoholic beverages), 4.1-100 (defining "interdicted person" to mean "a person to whom the sale of alcoholic beverages is prohibited by order pursuant to this title"). Thus, these interrelated statutes must be construed together to give effect to their various provisions and, because they are quasi-criminal in nature, a "relatively strict" test for vagueness applies here. *Hoffman*, 455 U.S. at 498–99.

2.

Plaintiffs contend that the term "habitual drunkard" did not provide fair notice to them about what conduct is targeted by Virginia's statutory interdiction scheme. The Commonwealth, however, responds that the term "habitual drunkard" has a readily ascertainable meaning. It argues that a person of ordinary intelligence can understand what is meant by the term "habitual drunkard," because Virginia Code § 4.1-333 requires that a person has "shown himself" to be an "habitual drunkard." Va. Code § 4.1-333. In the Commonwealth's view, Plaintiffs' allegations that they often had difficulty maintaining sobriety in public places due to their alcoholism demonstrate that their

13

conduct falls within any definition of "habitual drunkard," and, thus, that the statute is not impermissibly vague as applied to them.

The purpose of the fair notice requirement is to enable citizens to conform their conduct to the proscriptions of the law. *See City of Chicago v. Morales*, 527 U.S. 41, 58 (1999) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939))); *Kolender*, 461 U.S. at 357. If a statute fails to provide any standard of conduct by which persons can determine whether they are violating the statute or does not provide "minimal guidelines to govern law enforcement," the statute is unconstitutionally vague. *See Kolender*, 461 U.S. at 358; *Cooper*, 842 F.3d at 842.

In the present case, the lack of any guidelines or standards regarding who qualifies as an "habitual drunkard" compels the conclusion that use of the term in the challenged scheme is unconstitutionally vague. Virginia's Alcoholic Beverage Control Act, of which this scheme is a part, does not define the term "habitual drunkard." *See* Va. Code § 4.1-100. And the few Virginia cases applying the challenged scheme have not provided a limiting construction of the phrase to satisfy the fair notice requirement. *See Hoffman*, 455 U.S. at 494 n.5 (explaining that when considering a void-for-vagueness challenge, a federal court must "consider any limiting construction that a state court or enforcement agency has proffered" (citation omitted)). Thus, the statutes and case law fail to provide any standards of what is meant by the term "habitual drunkard." *Cf. Capital Assoc. Indus., Inc. v. Stein*, 922 F.3d 198, 210–11 (4th Cir. 2019) (concluding that the statute prohibiting unauthorized practice of law was not impermissibly vague because "[t]he

14

statutes and state case law collectively provide an extensive definition of what it means to practice law").

Our principal dissenting colleague maintains that the "sole purpose" of interdiction proceedings under Virginia Code § 4.1-333 is "to provide notice" to high-risk persons about the type of conduct Virginia prohibits. Dissent at 70 (Wilkinson, J.). In doing so, however, he inverts Virginia's statutory scheme. Once labelled an "habitual drunkard," a person may be on notice about the conduct prohibited, but it does not follow that the person was also on notice that he or she could be interdicted. Stated differently, persons informed that they can no longer possess alcohol because they are an "habitual drunkard" are not thereby put on notice about what conduct led to that adjudication in the first place.

And, plainly, the term "habitual drunkard" itself does not "assist in clearly articulating the proscriptions of the ordinance." *Morales*, 527 U.S. at 51. To begin, the word "habitual" is itself susceptible to numerous interpretations. "Habitual" means "of the nature of a habit . . . customarily doing a certain thing." *Habitual*, Webster's International Dictionary (3d ed. 2002). But a habit can also be a "custom," a "nearly involuntary" practice, a "normal manner of procedure," or something done with "frequent repetition." *Id.* Thus, on its own, the word "habitual" does not provide any principles or standards for determining how often or regularly an act must be performed to constitute "habitual" behavior. *See Cooper*, 842 F.3d at 843 (concluding that the term "regularly scheduled" was unconstitutionally vague because the statute at issue did not explain what "regular" meant in context); *Lytle v. Doyle*, 326 F.3d 463, 469 (4th Cir. 2003) ("[T]he vagueness that dooms this ordinance is not the product of uncertainty about the normal

15

meaning of [the term at issue], but rather about what specific conduct is covered by the statute and what is not." (internal quotation marks and citation omitted)).

In the context of the present case, therefore, several questions immediately arise concerning who may be adjudicated an "habitual" drunkard. For example, must a person engage in a pattern of drinking over time that establishes a "normal manner of procedure," or is it enough that the person drinks many alcoholic beverages over an extended period? Or is a "habit" established if the person drinks numerous alcoholic beverages only every Friday and Saturday night? The language of the challenged scheme does not provide any guidance to answer these or a myriad of other questions.

Likewise, the term "drunkard" does not provide any meaningful guidance regarding proscribed conduct. In *Hancock v. Cox*, the Supreme Court of Virginia held that a civil statute providing for the commitment of "alcoholics" was unconstitutionally vague, because the statute lacked any definition to determine "when a person is an alcoholic." 183 S.E.2d 149, 151–52 (Va. 1971). Similarly, in *Booth v. Commonwealth*, the court held an earlier version of this scheme, which provided for the interdiction of any person who has "shown himself to be an *improper person* to be allowed to purchase alcoholic beverages," to be impermissibly vague, because the term "improper person" allowed "arbitrary interpretation" and enforcement. 88 S.E.2d 916, 917–18 (Va. 1955) (emphasis added).

The same is true here. Black's Law Dictionary defines "drunkard" as "[s]omeone who habitually consumes intoxicating substances excessively" or "[an] alcoholic." *Drunkard*, Black's Law Dictionary (10th ed. 2014). To our dissenting colleagues, this

16

type of general definition is the end of the matter.  Dissent at 72 (Wilkinson, J.); Dissent at 82 (Diaz, J.).  But such a conclusion relies entirely on a tautology:  a person who drinks alcoholic beverages excessively is a drunkard and, therefore, a person would easily understand that a person is an "habitual drunkard" if they regularly drink alcohol to excess.  This definition entirely fails to answer the question of what the Virginia's interdiction scheme meant by "drunkard."  General definitions of the term "drunkard" do not identify how much alcohol a person must consume before such consumption is considered "excessive" or, as noted above, what frequency of behavior constitutes a "habit."  Thus, such definitions fail to impart any standards for determining whether a given individual is a "drunkard."[8]

This absence of meaningful guidance is further illustrated when the term "habitual drunkard" is compared with the word "intoxicated" as used in Virginia's public intoxication statute.  A conviction for public intoxication requires proof that a person is "intoxicated."  *See* Va. Code § 18.2-388.  "Intoxication" in turn is expressly defined as "a condition in which a person has drunk enough alcoholic beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior."  *Id.* § 4.1-100.  Thus, a person in a public place who has consumed enough alcohol to

---

[8] Although the district court in *Fisher*, 486 F. Supp. at 315, and the Court of Appeals of Virginia in *Jackson v. Commonwealth*, 604 S.E.2d 122, 125 (Va. Ct. App. 2004), proposed a definition of the term "habitual drunkard" which states that the term "encompasses one who, like the plaintiff, is admittedly in the continual habit of being intoxicated from alcohol," for the reasons just explained, we conclude that that definition does not provide any meaningful guidance about how to decide whether an individual should be considered an "habitual drunkard."

17

impair his physical movement or speech is notified by the language and definitions in Virginia Code § 18.2-388 of the conditions under which he may be charged with public intoxication. *See United States v. Brown*, 401 F.3d 588, 597 (4th Cir. 2005). In contrast, this scheme lacks any substantive guidance regarding what is required to establish that a person is an "habitual drunkard." Indeed, the fact that Virginia's Alcoholic Beverage Control Act specified what behavior constitutes being "intoxicated" with respect to the state's public intoxication offense, Va. Code § 4.1-100, but left undefined the term "habitual drunkard" in its interdiction scheme, *id.* § 4-1.333, demonstrates that the legislature intended each term to target different behavior, *Forst v. Rockingham Poultry Marketing Coop., Inc.*, 279 S.E.2d 400, 404 (Va. 1981) ("When the General Assembly uses . . . different terms in the same act, it is presumed to mean . . . different things.").

Counsel for the Commonwealth stated at oral argument that an "habitual drunkard" is someone who "causes harm to other persons or their community" as a result of his or her repeated drunkenness. But this "harm" requirement is not found in the challenged scheme, nor does the concept appear in any Virginia or federal case interpreting it.[9] Thus, the determination whether a certain person qualifies as an "habitual drunkard" is left to the subjective view of judges and law enforcement officials. *See Kolender*, 461 U.S. at 358 ("[W]here the legislature fails to provide . . . minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."); *Papachristou*, 405 U.S.

_____

[9] Indeed, the word "harm" does not appear a single time in *Fisher v. Coleman*, 486 F. Supp. 311, or *Jackson v. Commonwealth*, 604 S.E.2d 122.

18

at 170 ("Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law."); *see also Booth*, 88 S.E.2d at 918 ("On the basis of such a portmanteau word . . . the judiciary has no standards with which to judge the validity of . . . action which necessarily involves, at least in large measure, subjective determination." (citation omitted)).

Determinations of this nature invite arbitrary enforcement. Police officers, prosecutors, and even state circuit court judges likely will have differing perceptions regarding what frequency of drunkenness exceeds the necessary threshold for a person to be considered an "habitual drunkard." The interpretation of the phrase therefore leaves open the widest conceivable inquiry about a person's behavior and depends "entirely upon the prohibition philosophy of the particular" individual enforcing the scheme at that moment. *Booth*, 88 S.E.2d at 917. Indeed, the absence of any standards or limiting language to assist in the interpretation of the term "habitual drunkard" supports Plaintiffs' assertion that the law was designed to target persons, including the homeless, that state officials deem undesirable. *See Papachristou*, 405 U.S. at 166 (observing that "[d]efiniteness is designedly avoided [in vagrancy laws] so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense"). The imposition of significant criminal penalties cannot rest on the use of such subjective standards, nor may a statute consign a person to the risk of significant penal consequences without first providing sufficiently definite notice of prohibited activities. *See Tanner v. City of*

*Virginia Beach*, 674 S.E.2d 848, 853 (Va. 2009). Because the determinations required by the Virginia scheme are not meaningfully constrained by the text of the statutes, those statutes plainly fail to give fair notice of the conduct to be avoided. *See Papachristou*, 405 U.S. at 166.[10]

The decisions of courts in other jurisdictions likewise fail to provide any aid in resolving this definitional quandary. There are almost as many definitions for terms such as "common drunk" or "habitual drunkard" as there are courts that have attempted to formulate them. *See, e.g.*, *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1046 (9th Cir. 2017) (en banc) ("The ordinary meaning of 'habitual drunkard' is a person who regularly drinks alcoholic beverages to excess."); *Tatum v. State*, 22 So.2d 350, 351 (Ala. Ct. App. 1945) ("A common drunkard is a person whose general rule of life is that of drunkenness . . . sobriety being the exception."); *Sowder v. Commonwealth*, 88 S.W.2d 274, 275 (Ky. 1935) (approving a jury instruction that defined "habitual drunkard" as a person who "has a fixed habit of frequently getting drunk, though not oftener drunk than sober, and though sober for weeks at a time"); *Commonwealth v. Whitney*, 71 Mass. 85, 87–88 (1855) (defining "common drunk" as a person who is "an habitual drunkard [and] is so to the disturbance of the public peace and good order"). Moreover, several courts have concluded that such terms simply are not amenable to any meaningful definition, given

---

[10] Additionally, because the Virginia scheme does not distinguish between private and public conduct, the term "habitual drunkard" lends itself to arbitrary enforcement of the interdiction process against homeless individuals in particular. *See* Brief of National Law Center on Homelessness & Poverty as *Amicus Curiae* in Support of Plaintiffs-Appellants, *Manning v. Caldwell* (No. 17-1320), at 13–14 (explaining that the term "habitual drunkard" has historically been used as a euphemism for the homeless).

20

the variety of differing definitions assigned to common terms of this nature. *See, e.g.*, *State v. Pugh*, 369 So.2d 1308, 1309–10 (La. 1979); *Ex Parte Newbern*, 350 P.2d 116, 123 (Cal. 1960) (en banc).

We do not require statutes to be models of "perfect clarity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). But even acceptably imprecise language must specify some standard of conduct both to guide the actions of individuals and to govern law enforcement. *See Cooper*, 842 F.3d at 842; *Lytle*, 326 F.3d at 469. Without the addition of some defining standards, members of both groups are left without any understanding of how the scheme should be applied.

The Commonwealth nevertheless contends that Plaintiffs' admitted difficulty in maintaining sobriety proves that, whatever the definition of "habitual drunkard," the term was meant to prohibit Plaintiffs' conduct. The first problem with this argument is that the record lacks any indication of the conduct that led to Plaintiffs' interdictions. Each of the named Plaintiffs were interdicted in absentia, and so have no knowledge of the evidence that was relied upon by the court in determining that they are "habitual drunkards." Although the interdiction orders for Manning and Williams state that the court considered "abstract[s] of conviction" as part of the evidence submitted in those plaintiffs' respective hearings, the interdiction orders consist entirely of boilerplate language that does not identify any offense on which those convictions were based, or the number of such convictions. And, as counsel for the Commonwealth admitted during oral argument, there is no requirement that a person be convicted of *any* offense to be interdicted as an

21

"habitual drunkard." Thus, the interdiction orders, without more, do not establish that Plaintiffs' conduct clearly was encompassed by Virginia's scheme.[11]

Moreover, Plaintiffs' acknowledgement that they have difficulty maintaining sobriety due to alcoholism does not establish that they are "habitual drunkards." Plaintiffs are not charged with the responsibility of defining statutory terms, and their acknowledgement of illness says nothing about the sweep of the statutory scheme. Supreme Court precedent requires that statutes be based on objectively discernable standards. *See, e.g.*, *Johnson v. United States*, 135 S. Ct. 2251, 2558 (2015); *Kolender*, 461 U.S. at 357; *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). And here, there is no basis on which to conclude that Plaintiffs' conduct was clearly prohibited by the challenged scheme.

In sum, the term "habitual drunkard" specifies *no* standard of conduct. It is thus unconstitutionally vague,[12] because the term invites the very type of arbitrary

---

[11] The district court appears to have relied incorrectly on Plaintiffs' post-interdiction arrests to conclude that these plaintiffs were sufficiently on notice of what conduct the scheme proscribed. But the fact that a person is arrested *after* being interdicted is irrelevant to the issue whether he or she should have been adjudicated an "habitual drunkard" in the first place. Indeed, an interdicted person is subject to arrest for merely possessing alcohol. Va. Code § 4.1-322. And it does not follow that mere possession of alcohol will inevitably lead to "habitual drunkenness." Otherwise, an overwhelming number of adults in the Commonwealth of Virginia likely would be considered "habitual drunkards."

[12] For this reason, the Commonwealth's attempt to frame this argument as a challenge to Plaintiffs' standing to bring a facial vagueness claim is unpersuasive. The question whether Plaintiffs' conduct clearly falls within the grasp of Virginia's scheme necessarily requires an evaluation of the merits of that vagueness challenge as applied to these plaintiffs. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010). And we have recognized that if a statute specifies "no standard of conduct," the statute is (Continued)

22

enforcement that the Constitution's prohibition against vague statutes is designed to prevent. *See Cooper*, 842 F.3d at 842–43. Accordingly, the challenged scheme's current use of the term "habitual drunkard" is unconstitutionally vague even as applied to these Plaintiffs, and we conclude that the district court thus erred in dismissing Plaintiffs' vagueness challenge under Rule 12(b)(6).

## III.

As we have explained, the term "habitual drunkard" as used in Virginia law is so vague as to offer no meaningful standard of conduct. But even if this term could be narrowed to apply only to those individuals who, like Plaintiffs, suffer from alcoholism, such a construction would raise independent Eighth Amendment concerns. *See* Appellees' Supp. Br. at 7 ("Whatever construction is given to the phrase . . . it surely applies to individuals who . . . 'pathologically pursue alcohol use' because they 'have a profound drive or craving to use alcohol' that 'is largely uncontrollable and inevitable . . . .'" (quoting Plaintiffs' complaint)). We now turn to those concerns.

### A.

The Eighth Amendment's Cruel and Unusual Punishments Clause "circumscribes the criminal process in three ways." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977). The Clause operates to (1) "limit[] the kinds of punishment that can be imposed on those

---

unconstitutionally vague notwithstanding the fact that some conduct may fall within the provision's grasp. *Cooper*, 842 F.3d at 842–43; *see also Johnson*, 135 S. Ct. at 2560–61.

23

convicted of crimes," (2) "proscribe[] punishment grossly disproportionate to the severity of the crime," and (3) "impose[] substantive limits on what can be made criminal and punished as such." *Id.*

Plaintiffs' Eighth Amendment challenge rests on the third limitation. This restriction is "one to be applied sparingly," *id.*, for a state of course has broad authority to define and prosecute criminal offenses. But a state's power to punish is not boundless, as the Supreme Court made clear more than fifty years ago.

The Court then held that a California statute that criminalized addiction "to the use of narcotics" violated the third limitation. *See Robinson v. California*, 370 U.S. 660, 660, 667 (1962); *see also Ingraham*, 430 U.S. at 667. Rejecting the state's contention that this prohibition constituted a valid exercise of its police power, the Court reasoned that a narcotics addiction was an illness, and "a state law which imprison[ed] a person thus afflicted as a criminal" constituted cruel and unusual punishment. *Robinson*, 370 U.S. at 666–67.

1.

In *Robinson*, the Supreme Court held that a state may not, consistent with the Eighth Amendment, punish an individual for being addicted to narcotics. Speaking for the Court, Justice Stewart explained that "at th[at] moment in history" no state would "attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease." *Id.* at 666. Rather, "a law which [would make] a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth

24

Amendments." *Id.* This was so, the Court held, because a state could not, consistent with the Constitution, punish a person for an illness. *See id.* at 667. In so holding, the *Robinson* Court expressly noted, as the state there recognized, that just as a "narcotic addict" is "in a state of mental and physical illness[,] [s]o is an alcoholic." *See id.* at 667 n.8.

Six years after the Supreme Court decided *Robinson*, the Court considered a challenge to a Texas statute that criminalized public intoxication. *Powell v. Texas*, 392 U.S. 514 (1968). The defendant, an alcoholic individual who was *not* homeless, argued that the Texas statute, like the statute in *Robinson*, punished an illness over which he had no control and so violated the Eighth Amendment. In a fractured decision (4–1–4), the Supreme Court affirmed Powell's conviction.

Four Justices in *Powell* interpreted *Robinson* to prohibit only the criminalization of "mere status." *Id.* at 532 (Marshall, J.) (plurality opinion). In their view, the Texas statute withstood constitutional challenge because it criminalized the *act* of being intoxicated in public rather than the *status* of alcohol addiction. These Justices did not suggest that alcoholism was not an illness. Nor did they contend that the Eighth Amendment allowed a state to prosecute an individual merely for being an alcoholic. Rather, they concluded that the Texas statute, unlike the law at issue in *Robinson*, did not criminalize "being an addict" or "being a chronic alcoholic." *Id.*

Four Justices voted to reverse Powell's conviction. Writing for the dissent, Justice Fortas explained that *Robinson* compelled this result because it stood for a principle at "the foundation of individual liberty and the cornerstone of the relations between a

25

civilized state and its citizens": the principle that "[c]riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." *Id*. at 567 (Fortas, J., dissenting, joined by Douglas, Brennan, & Stewart, JJ.). Because Powell — an alcoholic — "was powerless to avoid drinking" and "once intoxicated, he could not prevent himself from appearing in public places," these Justices would have found Powell's conviction violated the Eighth Amendment. *Id*. at 568–70. The dissenters believed that "the essential constitutional defect . . . [was] the same as in *Robinson*, for in both cases the particular defendant was accused of being in a condition which he had no capacity to change or avoid." *Id.* at 567–68.

Justice White provided the decisive fifth vote to uphold Powell's conviction. In doing so, however, Justice White expressly rejected the act-status rationale adopted by the plurality and advocated by our dissenting colleagues. *See id.* at 548–49 (White, J., concurring in the result).[13] As Justice White explained:

> Unless *Robinson* is to be abandoned, the use of narcotics by an addict must be beyond the reach of the criminal law. Similarly, the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk.

---

[13] Under the rule set forth in *Marks v. United States*, 430 U.S. 188 (1977), Justice White's opinion constitutes the holding of the Court. The *Marks* rule teaches that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Id.* at 193 (internal quotation marks and alterations omitted); *cf. Hughes v. United States*, 138 S. Ct. 1765, 1771–72 (2018). As the parties agree, *see* Reh'g Petition at 15; Reh'g Opp. at 10, this rule requires us to treat Justice White's concurrence, the narrowest ground supporting the Court's judgment, as "the holding of the Court." *Marks*, 430 U.S. at 193.

*Id.* Agreeing with the four dissenters, Justice White concluded that the critical question was not whether the state statute punished an "act" or a "status," but rather "whether volitional acts brought about the 'condition'" of public intoxication and "whether those [volitional] acts [were] sufficiently proximate to the 'condition.'" *Id*. at 550 n.2. Finding that Powell had not made the necessary evidentiary showing, Justice White voted to narrowly affirm his public intoxication conviction. *Id.* at 554.

In reaching this conclusion, Justice White specifically contemplated a case, like the one at hand, in which no volitional act was required for conviction. In the context of the public intoxication statute at issue there, he explained that "chronic alcoholics must drink and hence must drink *somewhere*," and while many chronic alcoholics "ha[d] homes, many others [did] not." *Id*. at 551 (emphasis added). Thus, if individuals could show *both* "that resisting drunkenness [was] impossible *and* that avoiding public places when intoxicated [was] also impossible," a statute banning public drunkenness would be unconstitutional as applied to them. *Id*. (emphasis added). In those circumstances, the statute would, in effect, "ban[] a single act for which [homeless alcoholics] may not be convicted under the Eighth Amendment — the act of getting drunk." *Id*. To do so, Justice White concluded, would punish "addiction under a different name." *Id*. at 548.

2.

Applying the teachings of *Robinson* and *Powell* to the factual allegations in Plaintiffs' complaint, we can only conclude that — even assuming the term "habitual drunkard," as used in Virginia law, could be limited to alcoholics — Plaintiffs have alleged a viable claim for relief under the Eighth Amendment. Plaintiffs allege they are

27

addicted to alcohol and that this addiction, like narcotics addiction, is an illness. They allege that their addiction causes them to "pathologically pursue alcohol use," without any volitional control over their drinking.

Plaintiffs thus allege that the challenged Virginia scheme targets them for special punishment for conduct that is both *compelled by their illness* and is *otherwise lawful* for all those of legal drinking age.[14] If true, the challenged scheme indeed violates the Eighth Amendment as applied to Plaintiffs. *See Powell*, 392 U.S. at 551 (White, J., concurring in the result) (where "resisting drunkenness [was] impossible and . . . avoiding public places when intoxicated [was] also impossible," conviction for being drunk in public would violate Eighth Amendment); *Robinson*, 370 U.S. at 666 ("[A] law which made a criminal offense of . . . a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment . . . .").

To avoid this straightforward result, Virginia argues that its statutory scheme is consistent with both *Powell* and *Robinson*. In doing so, the Commonwealth primarily seeks to narrow the scope of *Powell*, and secondarily asserts that its interdiction scheme punishes actions rather than "being" and so comports with *Robinson*. Both efforts fail.

---

[14] As noted above, Plaintiffs allege that the Virginia statute targets *homeless* alcoholics, rather than *all* alcoholics. *See supra* note 10. But this allegation is immaterial to Plaintiffs' Eighth Amendment challenge because, as the Commonwealth explains, its statutory scheme, unlike that at issue in *Powell*, is not limited to outdoor or public conduct. Reh'g Opp. at 5–6. What matters under the Eighth Amendment is that Plaintiffs allege that the Commonwealth has singled them out for special punishment for otherwise lawful conduct that is compelled by their illness.

As to *Powell*, the Commonwealth concedes that Justice White's concurrence "offers the narrowest basis for the Court's fractured decision," and so is controlling under the *Marks* rule. Reh'g Opp. at 10; *see Marks*, 430 U.S. at 193. The Commonwealth contends, however, that most of Justice White's opinion is "dicta." Reh'g Opp. at 11–12. According to the Commonwealth, the *Marks* rule only requires us to adhere to Justice White's concurrence to the extent that when an "offense involves at least one volitional element, the Eighth Amendment does not bar criminal prosecution." *Id.* at 12. In Virginia's view, we are free to ignore the rest. *Id.*

Even if we were to accept the Commonwealth's characterization that Justice White's controlling analysis — including his rejection of the act-status distinction on which the Commonwealth and our dissenting colleagues now rely — constitutes "dicta," we cannot agree that we are free to ignore it. To the contrary, we routinely afford substantial, if not controlling deference to dicta from the Supreme Court. *See, e.g.*, *NLRB v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016); *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012). Respect for the rule of law demands nothing less: lower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law.

Such deference seems particularly warranted here, given that the "dicta" the Commonwealth urges us to disregard was so central to Justice White's result. This is not a case where a single jurist offered his unsolicited views on a tangential issue in passing. To the contrary, Justice White made clear that he voted to affirm Powell's conviction *not*

29

because of the act-status theory relied on by the plurality, but *solely* because Powell had not produced facts establishing the involuntariness of his public alcoholism. *See Powell*, 392 U.S. at 549 n.1 (White, J., concurring in the result).[15] And Justice White's view as to the crucial importance of this fact was shared by four other Justices.[16] Particularly under these circumstances, we cannot accept the Commonwealth's invitation to cast aside the reasoning underlying what it concedes is the controlling opinion in *Powell*.

Moreover, even if we were free to narrow *Powell* to the one-sentence holding that the Commonwealth advances, *Robinson* would require the same result. Plaintiffs allege that their drinking is not "voluntary" and, thus, this case does not "involve[] at least one volitional element." Reh'g Opp. at 12. At the motion to dismiss stage, we must take Plaintiffs' allegations as true, and these allegations place us squarely within the holding

---

[15] Justice White's disagreement with the dissenters thus turned on whether Powell had made a sufficient showing *in his case* to challenge his conviction. *Compare id*. at 568 & n.31 (Fortas, J., dissenting, joined by Douglas, Brennan, & Stewart, JJ.) (adopting trial judge's findings), *with id*. at 549 (White, J., concurring in the result) (reasoning "[n]othing in the record before the trial court supports the" conclusion that "Powell was a chronic alcoholic with a compulsion . . . to frequent public places when intoxicated"), *and id*. at 521 (plurality op.) ("Whatever else may be said of them, those are not 'findings of fact' in any recognizable, traditional sense in which that term has been used . . . ."). As to the substantive limits imposed by the Eighth Amendment, Justice White's views aligned far more with the dissent than the plurality.

[16] We note that Justice (then-Judge) Kavanaugh has suggested that under a faithful application of the *Marks* rule, such views, if shared by five Justices, are binding on lower courts. *See United States v. Duvall*, 740 F.3d 604, 616 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing en banc) (arguing "lower court[s] . . . must strive to reach the result that a majority of the Supreme Court would have reached in the current case" by "run[ning] the facts and circumstances of the current case through the various tests articulated by the Supreme Court in the binding case"). We need not determine today whether this is the proper reading of *Marks*, as our result would be the same in any event.

of *Robinson*, which bars Virginia from criminalizing Plaintiffs' illness.[17] In fact, four years after *Robinson*, this Court applied that case to hold that "punish[ing] an involuntary symptom of a status" — namely, enforcing a criminal "public intoxication" statute against a "chronic alcoholic" — was unconstitutional. *Driver v. Hinnant*, 356 F.2d 761, 765 (4th Cir. 1966).[18] That principle applies in equal force today.

In arguing to the contrary, the Commonwealth heavily relies on the fact that the challenged Virginia scheme operates in two steps. Recall that Virginia law first permits a court to enter a civil interdiction order "prohibiting the sale of alcoholic beverages . . . until further ordered" to a person who "has shown himself to be an habitual drunkard." Va. Code § 4.1-333(A). Then state law makes it a Class 1 misdemeanor — punishable by up to a year in jail, *see* Va. Code § 18.2-11(a) — for an interdicted person to "possess any alcoholic beverages" or to "consume, purchase or possess, or attempt to consume, purchase or possess, any alcoholic beverage," Va. Code §§ 4.1-322, 4.1-305.

---

[17] The principal dissent suggests that our interpretation of this precedent "runs headlong into a large chorus of circuit court opinions" holding to the contrary. Far from it. Of the four cases the principal dissent cites in support of this assertion, two erroneously treated the plurality opinion in *Powell* as the holding of the Court, *see Fisher*, 639 F.2d at 192; *United States v. Stenson*, 475 F. App'x 630, 631 (7th Cir. 2012), and two are cursory and unpersuasive decisions from the same circuit, *see Joel v. City of Orlando*, 232 F.3d 1353, 1362 (11th Cir. 2000); *United States v. Benefield*, 889 F.2d 1061, 1064 (11th Cir. 1989). In fact, the only other circuit to squarely confront the issue has arrived at the same conclusion we reach here. *See Martin v. City of Boise*, 920 F.3d 584, 616–17 (9th Cir. 2019).

[18] After affirming the constitutionality of this Virginia statute on vagueness and Eighth Amendment grounds, the *Fisher* court compounded its error by adopting the district court's suggestion that *Powell* "overruled and made inapplicable the holding[] . . . of *Driver*." *Fisher*, 486 F. Supp. at 316. As we have explained, Justice White's controlling opinion in *Powell* did no such thing.

31

Virginia's two-pronged statutory scheme may be less direct than the statute at issue in *Robinson*, but it yields the same result: it effectively criminalizes an illness. *Robinson*, 370 U.S. at 667–68. If the statute challenged in *Robinson* had instead allowed California to "interdict" prescription drug addicts and then arrest interdicted addicts for filling those prescriptions, the statute *effectively* would also have criminalized "being addicted to narcotics" even if it *nominally* punished only filling prescriptions. Such a statute would surely be just as unconstitutional as the statute in *Robinson*, and for precisely the same reasons.

Similarly, although Virginia's statutory scheme may nominally penalize "possession" or "consumption," even a sufficiently definite construction limited to alcoholics effectively targets and punishes Plaintiffs based on their illness, which *Robinson* holds violates the Eighth Amendment.[19] As Justice White explained, the thin distinction between "hav[ing] an irresistible compulsion" and "yield[ing] to such a compulsion" is not one of constitutional magnitude under *Robinson*. *See Powell*, 392 U.S. at 548 (White, J., concurring in the result). That the Commonwealth civilly brands

---

[19] The dissents fundamentally err by presuming that the *Robinson* Court somehow embraced the act-status distinction on which the Commonwealth now relies. To do so, the dissents must ignore *Robinson*'s core holding: that a state may not, consistent with the Eighth Amendment, target a person for punishment based on an illness. *Robinson*, 370 U.S. at 666–67 (holding "a state law which imprisons a person" afflicted with an illness "inflicts a cruel and unusual punishment"). In his controlling opinion in *Powell*, Justice White recognized that the act-status distinction could not be squared with this core holding. 392 U.S. at 548–49 (White, J., concurring in the result) ("Unless *Robinson* is to be abandoned, . . . the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk."). Thus, Justice White simply applied the Court's holding in *Robinson*; he did not alter that holding in *Powell* and neither do we.

alcoholics as "habitual drunkards" before prosecuting them for involuntary manifestations of their illness does nothing to cure the unconstitutionality of this statutory scheme.[20]

We therefore conclude that, even if the term "habitual drunkard" could be construed to apply only to those who suffer from alcoholism, Plaintiffs have stated an independent claim that the challenged statute violates the Eighth Amendment.

B.

Our Eighth Amendment holding is narrow. Consistent with *Robinson* and *Powell*, Plaintiffs have limited their Eighth Amendment challenge to what they allege is targeted criminalization, in the first instance, of conduct that is an involuntary manifestation of their illness, and that is otherwise legal for the general population. Put differently, Plaintiffs allege that, as applied to them, the challenged statutory scheme threatens them with arrest and incarceration for conduct that is not proscribed as a consequence of a prior criminal conviction, does not rest on even a single volitional element, and is lawful for all others of legal drinking age.

Plaintiffs do not challenge the constitutionality of any restrictions imposed after conviction of a crime, and our holding does not prevent the government from utilizing

---

[20] Only Virginia and Utah retain interdiction laws today, and it is unclear how one is interdicted under Utah law and to what extent the Utah statute is applied in practice. Utah Code § 32B-1-102. That the vast majority of states eschew interdiction schemes suggests another reason to doubt their constitutionality. *See Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (explaining that because "the words of the [Eighth] Amendment are not precise" and "their scope is not static[,] [t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

such prophylactic measures to thwart criminal misconduct. Unquestionably, courts may restrict an individual's liberty pursuant to a criminal sentence, and (in some cases) may continue to do so after his formal sentence has concluded. Courts are thus entitled in appropriate cases to impose and enforce targeted restrictions as conditions of supervised release, probation, parole, or release from criminal custody, even on persons who suffer from certain illnesses. *See, e.g.*, 18 U.S.C. § 3583(d) (permitting district courts to order conditions of supervised release that, among other things, "involve[] no greater deprivation of liberty than is reasonably necessary for the purposes set forth in" 18 U.S.C. §§ 3553(a)(2)(B)–(D)); 34 U.S.C. § 20913 (establishing sex offender registry); *id.* § 20911(1) (defining "sex offender" as "an individual who was convicted of a sex offense"). Plaintiffs' limited challenge does not implicate such post-conviction restrictions, nor does our holding cast any doubt on their continued viability.

Plaintiffs also wisely confine their Eighth Amendment challenge to conduct that is an involuntary manifestation of the very illness that triggers the Commonwealth's scheme. *Robinson*, *Powell*, and our holding here are so cabined. Thus, our analysis does not call into question substantive criminal laws, like penalties for underage drinking and prohibitions against driving while intoxicated, that do not involve conduct that is an *involuntary manifestation* of an illness.[21]

---

[21] As noted above, the plaintiffs have not challenged the portion of the Virginia statutory scheme providing for the interdiction of individuals who have been convicted of driving while intoxicated. *See supra* note 1.

34

Moreover, Plaintiffs do not seek an exemption from generally applicable criminal laws, and our reasoning does not offer them one. A state undoubtedly has the power to prosecute individuals, even those suffering from illnesses, for breaking laws that apply to the general population. That is so because such laws — even when enforced against sick people — reflect a state's considered judgment that some actions are *so dangerous* or contrary to the public welfare that they should lead to criminal liability *for everyone* who commits them. Faithfully following *Robinson* and *Powell*, as we do, does not provide an alcoholic escape from prosecution for such behavior. *See Powell*, 392 U.S. at 552 n.4 (White, J., concurring) (emphasizing that the Eighth Amendment does not bar a state from convicting "the heavily intoxicated, compulsive alcoholic . . . for committing crimes involving much greater risk to society"). Thus, contrary to the principal dissent's suggestion, our holding neither creates nor supports the notion of a nonvolitional defense against generally applicable crimes.

Finally, our holding does not unduly restrict "[t]he broad power of a State to regulate" alcohol within its borders. *Robinson*, 370 U.S. at 664. As the Court explained in *Robinson*, "[t]here can be no question of the authority of the state in the exercise of its police power to regulate the administration, sale, prescription and use of dangerous and habitforming drugs." *Id.* (internal quotation marks omitted). Nor does the Eighth Amendment tie the hands of state officials seeking to address the ill effects of alcoholism. "[T]he range of valid choice[s] which a State might make in this area is undoubtedly a wide one, and the wisdom of any particular choice within the allowable spectrum is not for us to decide." *Id*. at 665.

35

What the Eighth Amendment cannot tolerate is the targeted criminalization of *otherwise legal* behavior that is an involuntary manifestation of an illness. Imprisonment for a short time — here, for not more than twelve months — does not, in the abstract, seem to be cruel or unusual punishment. But, as the Supreme Court in *Robinson* recognized, "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." 370 U.S. at 667. If, as Plaintiffs allege, Virginia has in the challenged statutory scheme criminalized and punished otherwise legal behavior by them, and that behavior is an involuntary manifestation of their illness, then Virginia has imposed cruel and unusual punishment just as surely as California did in *Robinson*.

IV.

In sum, we hold that the challenged Virginia statutory scheme is unconstitutionally vague, and that even assuming it could be limited to those suffering from alcoholism, Plaintiffs have stated an Eighth Amendment claim under both *Robinson* and *Powell*. In so holding, we expressly take the step the panel could not: we overrule our flawed decision in *Fisher*, 639 F.2d 191, which bound the district court in this case as to both claims.

In *Fisher*, we affirmed the constitutionality of the Virginia scheme "for reasons sufficiently stated by" the district court, *id*. at 192, thus adopting reasoning that rejected a vagueness challenge and incorrectly treated the plurality opinion in *Powell* as the holding of the Court without deference to, or even acknowledgment of, Justice White's

36

controlling concurrence, *see Fisher*, 486 F. Supp. at 316. *Fisher* was wrong when decided, and we explicitly overrule it today.

Without question, the many homeless citizens of Virginia who struggle with the effects of alcohol on their mental and physical health are entitled to guidance and fair notice under the law. They have not been given such direction in the current version of this statutory scheme. While necessary changes in the law may not alter the choices that they make or enhance the quality of their life, at least the government will not be compounding their problems by subjecting them to incarceration based on the arbitrary enforcement of ambiguous laws or, at best, the targeted criminalization of their illnesses.

Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

BARBARA MILANO KEENAN, Circuit Judge, with whom Judge MOTZ and Judge THACKER join, concurring:

In my view, the alarmist tone of the principal dissent warrants separate comment. Among other salvos, the principal dissent characterizes the majority opinion as "an assault upon the constitutional, democratic, and common law foundations of American civil and criminal law." Additional remarks include likening the members of the majority to "Caesar Augustus," accusing the majority of "usurp[ing] the American Constitution," and alleging that our decision today will exacerbate the abuse of women.

What were the principal dissenters reading when they reached these conclusions? Surely not the majority's opinion, addressing arguments that a Virginia statutory scheme is vague and targets homeless alcoholics based on their compulsion to consume alcohol.

I make these observations because I worry about the message that we convey to the public when we attempt to bolster a legal analysis by making assertions suggesting malfeasance by judges who disagree with our position. And what message do we send to trial judges and lawyers who know that such assertions are false? Will they view these broadsides as evidence of institutional disharmony? Such attacks are not part of a "vigorous exchange of views," but instead detract from any substantive analysis.

As judges, we all take our duty to faithfully interpret the law as a solemn obligation. That we reach different conclusions in applying the law to a given case should be of no moment. What is truly important is that we have a legal system that allows for good-faith disagreements and provides for further review by a higher court.

Our Court has a cherished tradition of civility.  In that spirit, I express hope that we will turn away from the use of inflammatory language, which diminishes the value of our work.

WILKINSON, Circuit Judge, with whom Judges NIEMEYER, AGEE, RICHARDSON, QUATTLEBAUM, and Senior Judge DUNCAN join, dissenting:

This ought to be a straightforward case. But the majority asks this court to take two unprecedented steps. First, it asks that we find—as no court previously has—that addiction gives rise to an Eighth Amendment right to abuse dangerous substances without the imposition of any criminal sanctions. Second, it insists that we expand vagueness doctrine to invalidate a civil statute that clearly delineates the conduct within its ambit.

The Eighth Amendment leaves to the states the decision as to which acts are worthy of the community's opprobrium. And so long as the state's proscriptions give sufficient notice of what acts are culpable, the vagueness doctrine does not stand in the way. The Virginia statutes at issue here prohibit specific acts regarding alcohol and do so for a variety of legitimate reasons. That should be all that is required.

Instead of simply applying the law as it is, my colleagues strive for something new; thrusting our court into not one, but two, jurisprudential quagmires. First, the majority has found—in the Eighth Amendment's prohibition on "cruel and unusual" punishments, of all places—constitutional protection for any act that is alleged to be "non-volitional," i.e. the result of some compulsion. Maj. Op. at 5. In doing so, it has discarded any pretense of a workable limiting principle, expanded the Eighth Amendment beyond any discernible limits, and overturned sixty years of controlling Supreme Court precedent (Part I).

Unfortunately, Supreme Court precedent will not be the only victim of this decision. The majority's new theory of the Eighth Amendment will foreclose a state's

40

ability to take reasonable steps to protect its citizens from serious and long recognized harms. The consequences will fall on the most vulnerable, especially the victims of domestic abuse and sexual assault. How ironic that the majority would stand on the cusp of the centennial of women's suffrage and deal a setback not only to the physical safety of women, but to their basic right to peace of mind (Part II). Its decision will also interject the federal courts into areas traditionally and wisely reserved for the states, subverting both the democratic process and dual sovereignty (Part III.A). The majority, moreover, has converted the Eighth Amendment into a constitutional provision for all seasons, designed to do what other constitutional provisions manifestly cannot (Part III.B).

It is hard to believe a single decision could inflict more damage, but this one proceeds to do just that. The majority, in an alternative holding, invokes the Due Process Clause to contort vagueness doctrine beyond recognition. It takes what has heretofore been a limited principle and extends it to a civil statute that is not only clear on its face, but exists solely for the purpose of giving fair notice of what the law requires. The majority's notion of civil vagueness imperils a whole range of previously uncontroversial statutes (Part IV).

My colleagues in the majority strain to present this case as "narrow" and inconsequential; a judicial ticket good for one train only. Maj. Op. at 33. I am not comforted. There is nothing "narrow" about the majority's holding or its reasoning. This case is an assault upon the constitutional, democratic, and common law foundations of American civil and criminal law, and most importantly, to the judge's place within it. I

cannot join journeys whose destinations are so shrouded in uncertainty. One day the last dolorous rays of sun will set upon the majority's approach. Sooner rather than later, I hope. But in all events, eventually, at the United States Supreme Court.

## I.

I begin with the Eighth Amendment question, for which we granted en banc review in the first place.[*] The majority professes to believe that states have "broad authority to define and prosecute criminal offenses," Maj. Op. at 24, but proceeds to hold that the Eighth Amendment nonetheless imposes a limit on a state's ability to proscribe *specific conduct* in its criminal law. For the nearly six decades since the decision in *Robinson v. California*, 370 U.S. 660 (1962), courts have consistently and emphatically rejected that view. Resolving this case requires nothing more than the straightforward application of settled constitutional law.

### A.

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Robinson v. California*, the Supreme Court held that this constitutional guarantee prevented a state from making it a crime "to be addicted to the use of narcotics." 370 U.S. 660 (1962). Unlike laws that "punish[] a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior

---

[*] This dissent draws in part from the now vacated panel opinion in *Manning v. Caldwell*, 900 F.3d 139 (4th Cir. 2018).

42

resulting from their administration," *id.* at 666, the statute before the Court in *Robinson* punished the mere "status" of narcotics addiction, untethered from any particular conduct. *Id.* Faced with a criminal sanction that so clearly departed from the traditional foundations of the criminal law, the Court held that the Eighth Amendment had been violated. As the Court reasoned, "[e]ven one day in prison would be cruel and unusual punishment for the 'crime' of having a common cold." *Id.* at 667.

The *Robinson* Court was careful to note the "broad power of the State to regulate the narcotic drugs traffic within its borders." *Id.* at 664. Indeed, a "State might impose criminal sanctions, for example, against the unauthorized manufacture, prescription, sale, purchase, or possession of narcotics" because those things constitute punishable conduct, not status. *Id.* The Court in *Robinson* thus considered and rejected precisely what the majority has now done, and that is to read its holding to prevent states from criminalizing any particular act associated with dangerous and addictive substances. Because the holding of *Robinson* is so emphatic on this point, it is worth quoting the relevant paragraph in full:

> The broad power of a State to regulate the narcotic drugs traffic within its borders is not here in issue. More than forty years ago . . . this Court explicitly recognized the validity of that power: 'There can be no question of the authority of the state in the exercise of its police power to regulate the administration, sale, prescription and use of dangerous and habitforming drugs . . . . The right to exercise this power is so manifest in the interest of the public health and welfare, that it is unnecessary to enter upon a discussion of it beyond saying that it is too firmly established to be successfully called in question.'

*Id.* at 664 (quotations and alterations omitted). The holding of *Robinson* is clear: the criminal law cannot punish who you are; it can only punish what you do. That simple

43

command has given rise to the "status-act distinction" or, if you will, "illness-act distinction" in our Eighth Amendment jurisprudence, a distinction that has remained untouched since *Robinson*, and respected until the majority's effort to unravel it today.

The Supreme Court has never wavered from the decision in *Robinson* and the status-act distinction that it articulated. In *Powell v. Texas*, 392 U.S. 514 (1968), decided only a few years after *Robinson*, a defendant challenged a Texas law that prohibited public drunkenness on the ground that his status as an alcoholic compelled him to violate the statute. In a divided opinion, the Supreme Court upheld the statute. *Id*. A four-justice plurality, authored by Justice Marshall, found that it was not the lack of volition on the part of the offender, but the lack of any conduct whatsoever, that had created a constitutional infirmity in *Robinson*, and that no such defect existed in the Texas statute. *Id*. at 533 ("[C]riminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*.").

Justice White, who cast the decisive fifth vote, left open the question of whether conduct compelled by addiction might be protected under *Robinson*. But because Powell "made no showing that he was unable to stay off the streets on the night in question," Justice White voted to uphold the conviction on the ground that Powell's behavior involved a volitional act. *Id*. at 553-54. Justice White wrote that it was "unnecessary to pursue at this point the further definition of the circumstances or the state of intoxication which might bar conviction of a chronic alcoholic for being drunk in a public place." *Id*. at 553. Because Justice White chose to resolve the case without reaching the broader

question of compulsion, the judgment in *Powell* neither extended or contracted *Robinson*, which was left undisturbed.

This has been the consensus view of the Supreme Court and our sister circuits ever since. Astonishingly, the majority has focused on what is at best an ambiguous opinion by a single justice, and has completely ignored the entirety of the legal landscape since *Powell* was handed down. Maj. Op. at 26-36. Worst of all, the majority has not even bothered to look at the approval of *Robinson* signaled by the Supreme Court itself.

To repeat, the Supreme Court has not walked away from *Robinson*. It has not embraced the majority's whole notion of nonvolitional conduct, which under *Robinson* would plainly constitute a proscribable act. Instead, long after the decision in *Powell*, the Supreme Court has routinely looked to *Robinson* as providing the applicable law for the Eighth Amendment. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 311 (2002); *Solem v. Helm*, 463 U.S. 277, 287 (1983); *Rummel v. Estelle*, 445 U.S. 263, 268 (1980). When the Supreme Court has cited to *Powell*, it has been to the four-justice plurality, which explicitly adopted the status-act distinction. *See, e.g.*, *Clark v. Arizona*, 548 U.S. 735, 774-75 (2006); *Montana v. Egelhoff*, 518 U.S. 37, 56 (1996) (plurality); *Medina v. California*, 505 U.S. 437, 449 (1992); *Ingraham v. Wright*, 430 U.S. 651, 667 (1977); *Marshall v. United States*, 414 U.S. 417, 426-27 (1974). Moreover, Eighth Amendment cases involving issues of mental capacity have been concerned with modes of punishment, which is the primary focus of the Amendment, rather than the substance of state criminal laws. *See Atkins v. Virginia*, 536 U.S. 304 (2002).

The majority now puts us at odds with the Supreme Court's understanding of its own decision. It also runs headlong into a large chorus of circuit court opinions—including from this court, *see Fisher v. Coleman*, 639 F.2d 191 (4th Cir. 1981)—which have upheld state laws criminalizing acts that were allegedly compelled. For instance, the Seventh Circuit held that an alcoholic who violated the terms of his parole by consuming alcohol "was not punished for his status as an alcoholic but for his conduct. Therefore, his claim for cruel and unusual punishment fails." *United States v. Stenson*, 475 F. App'x 630, 631 (7th Cir. 2012) ("Under *Powell*, punishment for unlawful conduct resulting from alcoholism is permissible."); *see also Joel v. City of Orlando*, 232 F.3d 1353, 1361 (11th Cir. 2000) ("A distinction exists between applying criminal laws to punish conduct, which is constitutionally permissible, and applying them to punish status, which is not."); *United States v. Benefield*, 889 F.2d 1061, 1064 (11th Cir. 1989) ("The considerations that make any incarceration unconstitutional when a statute punishes a defendant for his status are not applicable when the government seeks to punish a person's actions."). In the rare case where the Eighth Amendment was found to invalidate a criminal law, the law in question sought to punish persons merely for their need to eat or sleep, which are essential bodily functions. *See Pottinger v. City of Miami*, 810 F. Supp. 1551, 1565 (S.D. Fla. 1992) ("For plaintiffs, resisting the need to eat, sleep or engage in other life-sustaining activities is impossible."). This is simply a variation of *Robinson*'s command that the state identify conduct in crafting its laws, rather than punish a person's mere existence.

My colleagues in the majority disagree, and instead tease their preferred reading from the dicta of a single justice. Maj. Op. at 26-36. By venturing so far from the Supreme Court's guidance, the majority has adopted a view of the Eighth Amendment that has never been necessary to the Supreme Court's resolution of any single case. The *Powell* decision, as earlier noted, was a 4-1-4 decision. Faced with a such a decision, which lacks a clear majority rationale for the judgment, federal courts are instructed that the "holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest ground." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quotations omitted). There may well be difficult cases concerning how best to apply *Marks*, but this is not one of them. As mentioned above, Justice Marshall's decision for four justices in *Powell* upheld the statute on the basis of the status-act distinction. Justice White concurred in this judgment because the statute in question involved an act that was clearly volitional, forestalling the need to examine whether and under what conditions nonvolitional conduct might be constitutionally shielded from criminal sanctions. The majority improperly pulls from this concurrence, which took pains not to decide a constitutional question, a new constitutional rule: that states may not criminalize conduct "compelled by [a person's] illness." Maj. Op. at 28. The problem, of course, is that this new rule is found nowhere in the Court's holding. The majority's quotation of selected sentences from the concurring opinion fails to recognize the ultimate point that Justice White never purported to reach the central question.

Because Justice White took a narrow view of the case, leaving the broader issues to the side, the *Powell* decision does not overturn or in any way disrupt *Robinson*. There

47

has never been any holding that *Robinson*'s status-act distinction has yielded to a new test focused on compulsion. As Judge Wilkey noted shortly after *Powell*, "the interpretation that *Robinson* held that it was not criminal to give in to the irresistible compulsion of a 'disease[]' weaves in and out of the *Powell* opinions, but there [was] definitely no Supreme Court holding to this effect." *United States v. Moore*, 486 F.2d 1139, 1150 (D.C. Cir. 1973) (en banc) (plurality opinion). The absence of such a holding, as well as the Supreme Court's repeated references to the status-act distinction as the law, means that we are bound to respect *Robinson* until some clearer and more definitive guidance emerges. Those who see in the *Powell* decision a repudiation of *Robinson* are mistaking themselves for occupants of a higher bench.

What we are left with, then, is simply a matter of fact. And as a matter of fact, for nearly sixty years courts at all levels have consistently affirmed *Robinson*'s basic holding: although states may not criminalize status, they may criminalize actual behavior even when the individual alleges that addiction created a strong urge to engage in a particular act.

The status-act distinction has endured because it works. States are given a clear constitutional line to respect in crafting their criminal laws. Lower courts are given a simple and principled directive to apply when assessing those laws in subsequent proceedings. By contrast, the majority's alternative "afford[s] substantial, if not controlling deference to dicta." Maj. Op. at 29. But the majority's approach utterly fails to provide a workable test for defining compulsion, which is the predictable result of relying on guidance divorced from what was necessary to resolve a concrete dispute. Nor

48

does the majority explain why such a test, whatever it is, applies to alcohol consumption, but is not equally applicable to narcotics use, sexual molestations, or other allegedly compelled acts. If the Supreme Court had ever rested an Eighth Amendment decision on the compelled nature of an act, there would likely be an answer to these questions. But because the majority has ventured far beyond the Court's actual judgments, it strands the doctrine at sea. Much better for us, in assessing an Eighth Amendment challenge, to limit our review to whether the law at issue has proscribed specific conduct, or in common law terms, an *actus reus*. If yes, our task comes to an end.

So yet again, the question for us is whether we should permit a 4-1-4 opinion that is at most ambiguous to overturn or greatly extend a longstanding and widely recognized Supreme Court opinion that the Court itself has repeatedly referenced and has never once seen fit to repudiate or otherwise disavow. It is in the end a matter of respecting both the Supreme Court's authority to overturn its own decisions, and the limits of a circuit court's authority to find circuitous routes around higher controlling precedent. The principle embodied in that precedent is plain. The vitality of *Robinson* is simply not an open question.

### B.

Under the status-act distinction, which must govern our consideration of this case, the Virginia statutes pose no defect whatsoever. Virginia has been careful to draft a statutory scheme that falls on the constitutional side of the line drawn in *Robinson*. This scheme is comprised of two parts: one civil and one criminal. The interdiction provision set forth in § 4.1-333 is a civil enactment. Under that provision, a person can be

interdicted, and therefore subject to specific alcohol-related prohibitions, on the basis of either a drunk driving conviction or designation as a "habitual drunkard." An interdiction order is not accompanied by imprisonment or a punitive fine. The Eighth Amendment's prohibition on "cruel and unusual punishment" has obvious criminal purposes. *See Ingraham v. Wright*, 430 U.S. 651, 664 (1977). A provision that puts a person on notice that *future acts* may result in criminal sanctions does not criminalize status for the simple reason that it does not criminalize anything. It is the *other* Virginia provisions, not § 4.1-333, that impose criminal sanctions.

While criminal prohibitions do come into play in §§ 4.1-322 and 4.1-305, those prohibitions apply only to affirmative acts: to "possess any alcoholic beverages" or to "be drunk in public," and to "consume, purchase or possess, or attempt to consume, purchase or possess, any alcoholic beverage." The whole world, apart from the majority, knows these things are acts. Appellants were arrested on the basis of committing these acts. That stands in stark contrast to the statute at issue in *Robinson*, under which a defendant could be charged even if the state never showed that he "used or possessed any narcotics." 370 U.S. at 666. The defendant's alleged compulsion simply does not enter into this analysis. The majority implausibly claims that the plaintiffs' "drinking is not 'voluntary,'" and so, somehow, "*Robinson* would require the same result." Maj. Op. at 30. But the problem in *Robinson*, as the Court explained, was not that the criminal sanction applied to "compelled," "involuntary," or "nonvolitional" acts; the problem was that the law applied to no act at all. The Virginia statutes do not "criminaliz[e] Plaintiffs' illness," Maj. Op. at

50

31; they criminalize specific acts. *See* Va. Code Ann., §§ 4.1-322, 4.1-305. They therefore lack the core defect of the law in *Robinson*.

I emphasize what I hope would be obvious: it would be unlawful for the state to simply round up "undesirable" persons based on their perceived status as addicts or drunkards. *Cf. Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972). It is inimical to personal dignity and liberty to bring criminal charges on the basis of who someone is. To allow any sort of roundup exercise would not only grossly augment the power of the state, but put that power to the most pernicious use. For that reason, there must be some behavioral link set forth in the law. But Virginia has been careful to observe that line. It has prohibited individuals deemed at a higher risk of alcohol abuse from possessing or consuming alcohol. This category includes not only habitual drunkards, but also people who have been convicted of drunk driving offenses and those under twenty-one. *See* § 4.1-305.

Perhaps aware that the status-act distinction is still operative, the majority strains to fit within the test, arguing that Virginia law "*effectively* criminalizes an illness." Maj. Op. at 32 (emphasis added). That argument, however, again ignores the fact that the Virginia scheme *actually* bases criminal liability on specific acts. *Robinson*, 370 U.S. at 662. Those acts can be done by any person subject to interdiction, regardless of their status as "homeless" or "alcoholic." The majority's claim that Virginia "nominally penalize[s] 'possession' or 'consumption,' . . . [but] effectively targets and punishes Plaintiffs based on their illness," Maj. Op. at 32, not only mischaracterizes Virginia law, but threatens to change the character of criminal law as we have known it.

51

Which laws criminalize illness and which do not? In trying to cabin its new constitutional theory, the majority emphasizes time and again that its holding will only reach statutes that criminalize "otherwise legal behavior." Maj. Op. at 36. My colleagues are silent, however, on just where this limit comes from. Surely not *Robinson* or *Powell*, both of which dealt with generally applicable criminal laws. Even Justice White's opinion in *Powell* noted that a constitutional test based on volition would collapse into factual squabbles about what constitutes addiction, what constitutes compulsion, and what crimes are serious enough to, in the court's view, overcome the nonvolitional claims of the accused. *See Powell*, 392 U.S. at 552, n.4. As the Justices themselves understood, such a position has no plain limiting principle.

I do not state this lightly. It is wise not to accept casually every "slippery slope" or "open-the-floodgates" argument that comes along. But in this case the potential breadth of the principle espoused by the appellants and the majority is staggering. Many criminal acts can be alleged to "effectively" be the result of some compulsion. Many statutes can be alleged to punish someone's illness. If human behavior is viewed as something over which human beings lack control, and for which they are not responsible, the implications are boundless. The examples extend beyond the discrete context of substance addiction. For instance, child molesters could challenge their convictions on the basis that their criminal acts were the product of uncontrollable pedophilic urges and therefore beyond the purview of criminal law. *See Kansas v. Hendricks*, 521 U.S. 346, 362 (1997) (upholding a sex offender statute where the law in question defined sex offenders as "suffering from a 'mental abnormality' or a 'personality disorder' that

prevents them from exercising adequate control over their behavior"). The same could be said not only of sex offenders, but of stalkers, domestic abusers, and others driven by impulses they were allegedly powerless to check. The Eighth Amendment has not, before today, been thought to absolve them of their wrongs. From this point on, however, "nonvolitional conduct" will enter the gallery of go-to phrases used to curtail the capacity of democratic governments to protect the people from a veritable slew of allegedly nonvolitional criminal acts.

## II.

## A.

In its rush to condemn the Virginia statute, the majority makes no more than passing mention of "the ill effects of alcoholism," Maj. Op. at 35, averting its eyes from the painful reasons why states regulate alcohol in the first place. Reading the majority's opinion, one would be forgiven for thinking the majority was discussing soda pop. But decades of research show that "[a] large number of crimes, especially violent crimes, are committed by intoxicated offenders." *Montana v. Egelhoff*, 518 U.S. 37, 49 (1996) (plurality) (citing Third Special Report to the U.S. Congress on Alcohol and Health from the Secretary of Health, Education, and Welfare 64 (1978)). The link between alcohol and violence has been well-documented for a century and motivated early efforts to limit alcohol consumption and intoxication. *See generally* John S. Billings et al., The Liquor Problem 10 (1905) ("[N]early fifty per cent[] of crime is referred to intemperance as one cause, and in thirty-one per cent[] it appears as a first cause."). Let us stipulate that

Prohibition was a wildly impractical experiment. Let us stipulate also that alcohol use in moderation visits little or no social harm. The days of national Prohibition are fortunately behind us. *See* U.S. Const. amend. XXI. But the days of alcohol abuse and concomitant violence are unfortunately not.

One particularly troubling example of violence driven by alcohol is domestic abuse. We all know the familiar story: a man pockets his Friday paycheck, heads off to the nearest bar, and stumbles home to commit what are too often unconscionable acts. The women's groups who led the Temperance Movement understood this menace all too well, and made violence in the home a rallying cry for their cause. *See* Note, Bernadette Dunn Sewell, History of Abuse: Societal, Judicial, and Legislative Responses to the Problem of Wife Beating, 23 Suffolk L. Rev. 983, 991 (1989) ("Temperance campaigners viewed domestic violence as inextricably connected with the evils of alcohol, and thus sought abolition as a means of protecting abuse victims.").

The scourge of alcohol-related violence is with us still. Studies show that more than 90% of domestic violence offenders, for example, used alcohol or other drugs on the day of the attack. *See* Daniel Brookoff et al., *Characteristics of Participants in Domestic Violence*, 277 J. Am. Med. Ass'n 1369 (1997). While Virginia's regulatory scheme applies to rich and poor alike, many crimes, fueled by alcohol, fall hardest on the most vulnerable. Women of limited means often lack the resources to engage counsel in cases of domestic abuse or to escape brutal treatment in what should be inviolate sanctuaries in their lives. Similarly, the sexual violence on American campuses is largely driven by "[m]en who reported heavy drinking." Christopher P. Krebs et al., *The Campus Sexual*

*Assault (CSA) Study*, Nat'l Inst. of Just., at 2-11 (October 2007). These campus sexual offenses, which are finally starting to receive the attention they deserve, endanger a shocking number of young women. *Id.* at xiii ("Nineteen percent of the women reported experiencing completed or attempted sexual assault *since entering college*."). Now we may expect that future attempts to impose even mild civil restrictions on heavy or habitual campus drinkers will be met with a nonvolitional conduct objection.

The majority goes to great lengths to say that it is not creating a "nonvolitional defense against generally applicable crimes." Maj. Op. at 35. It believes its opinion can somehow be confined to the context of this case, despite the undeniable breadth of its dual holdings. That is not how law's progressions work. The very day that a doctrine of this nature is announced, a court relinquishes control over its course. Many insidious principles seek innocuous entries, and the majority has no control over how its new rule will be applied.

It takes no great imagination to develop the nonvolitional possibilities. *See supra*, at 52-53. The severe "practical considerations" surrounding a new doctrine "serve to highlight the wisdom of the traditional limitations" on a court's function and ought to prevent us from taking a first step when we do not know where the subsequent steps will lead. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 58 (1973) ("[W]e do no violence to the values of federalism and separation of powers by staying our hand."). I take no solace whatsoever in the majority's assurance that its decision is a narrow one; it is but the momentary narrowness of a waxing quarter moon.

## B.

I do not understand why the majority would go to such lengths to thwart attempts to ameliorate these conditions. Virginia has developed a comprehensive policy to confront the pervasive problem of alcohol abuse. But the majority, despite its protests to the contrary, would use "the Eighth Amendment [to] tie the hands of state officials." Maj. Op. at 35. The interdiction statute at issue here is one part of Virginia's larger scheme. The law sanctions relatively minor acts, like using and possessing alcohol, in order to forestall more serious criminal misconduct. The statute achieves this result through a two-step approach: first, a civil determination identifies people who are more likely to commit serial and grave offenses. Va. Code Ann. §§ 4.1-333, 4.1-334. Second, these individuals are then subject to milder criminal sanctions on relatively small acts to head off more heinous criminal misconduct. *Id.* §§ 4.1-322, 4.1-305. Any person who satisfies the criteria for the first step, whether because of drunk driving or habitual drinking, is subject to the criminal prohibitions of the second step. By establishing this framework, Virginia has made the judgment that the purchase or consumption of alcohol by persons with a history of heavy drinking could lead them to commit more dangerous acts, like drunk driving, domestic abuse, or sexual assault.

States have always been entrusted with regulating addictive substances, most especially alcohol. *See Cal. Retailer's Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980) ("The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system."). In exercising its broad powers in this area,

Virginia has chosen a prophylactic approach, focusing its resources on those who are most likely to present a heightened future risk. This includes those convicted of drunk driving offenses or prior alcohol-related offenses, as well as those who are designated "habitual drunkards," which can follow from repeated misconduct while intoxicated. Va. Code Ann. §§ 4.1-333, 334; *see Jackson v. Commonwealth*, 604 S.E.2d 122, 124 (Va. Ct. App. 2004). In adopting this policy, the state legislature has applied its restrictions to those who have repeatedly failed to comply with alcohol laws in the past, concluding that they are more likely than others to do so in the future. Given that irresponsible alcohol consumption increases the likelihood of more grave offenses, the Commonwealth surely had good reason to think that the population of prior abusers posed a greater risk to the community than others who lack such a history.

The use of such a prophylactic scheme is hardly uncommon. Many laws, state and federal, share the two-step structure adopted by Virginia, which imposes minor sanctions on those who present a heightened danger in order to lessen the risk that the danger will actually come to pass. For example, the Sex Offender Registration and Notification Act (SORNA) requires federal sex offenders to notify the states where they live and work of their prior conviction. *See* 34 U.S.C. § 20913 (2012). Once the prior conviction has established that a person poses a social risk, his mere failure to register can give rise to criminal liability. *Id.* In that way, SORNA uses criminal law to ensure that past sexual offenders cannot in the future fly under the radar.

The majority casts SORNA aside by claiming that "post-conviction restrictions" are not implicated here. Maj. Op. at 33-34. The majority distinguishes post-conviction

57

restrictions, such as supervised release, noting that those remain acceptable. That distinction is, to say the least, awkward. The majority purports to hold that schemes such as Virginia's constitute cruel and unusual punishments. Since when are cruel and unusual punishments on nonvolitional conduct suddenly permissible post-conviction? Post-conviction limits are based on the same calibration of restriction to risk as are the Virginia statutes here. The fact that Virginia has elected to fire a warning shot before imposing criminal sanctions is to its credit, not otherwise.

Other analogies to Virginia's prophylactic approach abound. Federal criminal law, for example, prohibits otherwise routine firearms purchases by individuals who have been found by a court in a civil proceeding to be mentally incompetent. Such restrictions reduce the risk those people pose to themselves and to others. *See* 18 U.S.C. §§ 922(g)(4); 924(a)(2). By the same token, a domestic abuser who violates a civil Temporary Restraining Order can be subject to criminal contempt proceedings. *See, e.g.*, Va. Code Ann. § 19.2-152.10, et seq. Once someone is found to pose a risk to his spouse or child, the simple act of coming within a certain distance of the protected persons or their home can give rise to criminal liability for "contempt of court." *Id.*

All of these laws have one thing in common: they apply milder sanctions to less serious infractions, such as the possession, use, or purchase of dangerous items and addictive substances or the failure to register, in order to reduce the risk of grave misconduct involving gun violence, sexual predation, or fatal accidents on the road. Virginia's alcohol laws adopt precisely this approach and similarly present no constitutional infirmity.

The majority renders this approach unconstitutional when the criminal acts are "both compelled by [the defendant's] illness and [are] otherwise lawful." Maj. Op. at 28. The "otherwise lawful" limitation is both wholly lacking in authority and ignores the valid reasons *why* prohibitions apply to some population cohorts and not to others. The reason is simply this: past actions give rise to present and future risks. To say that a state acts impermissibly on this basis is an astonishing proposition, and one that prohibits legislative bodies from making the altogether practical assessments of risky behaviors that are entirely within the legislative prerogative.

Legislatures, whether state or federal, commonly calibrate restrictions to risk in order to protect the public. The federal Bail Reform Act, for example, authorizes a judge to require pre-trial detention if he finds that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Supreme Court rejected a constitutional challenge to this statute, finding "there is no doubt that preventing danger to a community is a legitimate regulatory goal," *United States v. Salerno*, 481 U.S. 739, 747 (1987), and that, to achieve this goal, Congress could focus "only on individuals who have been arrested for . . . extremely serious offenses." *Id.* at 750. Contrary to the majority's position that a selective statute is inherently problematic, *e.g.*, Maj. Op. at 28, the Court instead saw this as a feature of the bail scheme, demonstrating a "narrow[] focus[] on a particularly acute problem . . . in which the Government interests are overwhelming." *Id.* at 750. Virginia's regulatory risk assessment here, like so many state laws that limit the use of automobiles, firearms, and alcohol, reflects the same approach.

59

The majority tries to frame its holding as "narrow," Maj. Op. at 33, affecting only Virginia's purportedly unique scheme. *Id.* at 33, n.20. To repeat, I cannot see how Virginia's prophylactic structure differs from the many others that share its two-step approach. I am therefore left to conclude that the only distinctive feature of what Virginia has done lies in the nature of the offense. As my colleagues apparently see it, consuming alcohol, even by those with a documented history of alcohol abuse, is just not the sort of conduct that warrants criminal sanctions. Given the comprehensive body of research pointing to the harms of alcohol abuse, I cannot agree. More importantly though, I do not feel empowered to weigh in on such a question in the first place.

There are many considerations that can and do inform legislative judgments regarding alcohol and addiction. There are many policy tools available to enforce these judgments once they have been made. Criminal law is but one of them, as are prophylactic laws that focus public resources on those most likely to cause harm. I would hope that settled law was enough to prevent the majority from second-guessing the Commonwealth's judgment. But I find it particularly distressing that at a time when we are beginning to make some modest progress on often alcohol-related offenses such as domestic violence and sexual assault that the majority feels itself empowered to hinder that progress. In doing so, it thwarts the efforts of Virginia to assure that the future of its citizens, and particularly the future of women in the Commonwealth, is measurably more secure than it has been in times past.

### III.

It is well to take a brief, broader look. The majority decision aspires to rework our constitutional system. It erodes the states' role as separate sovereigns entrusted to define the criminal law within their own borders. And it pushes the Eighth Amendment as a catch-all corrective for perceived ills that other constitutional provisions have left unredressed.

### A.

The majority upends our system of dual sovereignty. It puts judges in policymaking roles reserved largely for legislatures and states. The reason for legislative responsibility over criminal law is fundamental: the criminal law exists to protect the safety of citizens, and ensuring the safety of the people is one of those things that popular government exists to do. State legislatures thus have considerable latitude to address social ills. What behavior to criminalize is not an exclusive state responsibility, but it is a core one: "Under our federal system, the 'states possess primary authority for defining and enforcing the criminal law.'" *United States v. Lopez*, 514 U.S. 549, 561, n.3 (1995) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)).

That is no impediment to the majority, which rushes in where others fear to tread. The Supreme Court has repeatedly been asked to make broad psychological pronouncements regarding addiction and mental illness, and has consistently emphasized its own inability to do so. *See Clark*, 548 U.S. at 771; *see also Powell*, 392 U.S. at 537 (plurality) ("It is simply not yet the time to write the Constitutional formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers."). As

the Supreme Court made clear decades ago, "[t]he lesson we have drawn is not that government may not act in the face of this uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments." *Jones*, 463 U.S. at 364, n.13. The Supreme Court should have saved its breath, so swiftly does the majority breeze by.

In its lecture on psychology and sermon to the states, the majority does not even acknowledge the many features of state law that already address issues of volition and compulsion. The criminal justice system of every state has in place numerous features designed to address nonvolitional conduct, among them *mens rea* requirements (willfully, knowingly); affirmative defenses such as provocation, self-defense, and in extreme cases insanity; and of course, sentencing proceedings where any nonvolitional characteristic or circumstance can be appraised and applied by a sentencing judge. *See, e.g.*, *Egelhoff*, 518 U.S. at 56 (plurality opinion). Those approaches to nonvolitional conduct often rely upon democratic input, making them far more sensitive and balanced than the constitutional theory developed by the majority on the fly.

Rather than focusing on what should matter, the majority thinks it is somehow relevant that Virginia's approach is different from that of many other states. Maj. Op. at 33, n.20 ("That the vast majority of states eschew interdiction schemes suggests another reason to doubt their constitutionality"). If sanctions are viewed by the majority as too stern, the appropriate course for mitigation is through reforms achieved through the states and in the legislative branch, not through the Eighth Amendment. It is inevitable that under federalism some states will develop policies that are more strict or lenient than others. Where the Virginia scheme falls on this spectrum is, as I have indicated, a matter

of debate. That variability, however, has always been thought to be a vibrant feature of our constitutional system: "Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other state." *Rummel*, 445 U.S. at 282. The rarity of a state's chosen policy is not a sound basis for condemnation, just as "not every widespread experiment with a procedural rule favorable to criminal defendants establishes a fundamental principle of justice." *Egelhoff*, 518 U.S. at 51 (plurality opinion).

Under our system of governance, the states are the primary expositors of the common law. The risk of having our Constitution resemble more and more a common law document, where meaningful restraints on judicial preferences are minimal, is all too real. *See Paul v. Davis*, 424 U.S. 693, 701 (1976) (rejecting a reading that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States"). All the richness and diversity of our fifty state democracies is now swept aside for a single policy preference. The majority thinks that because it invokes the word "constitution" it is empowered through that incantation to displace other branches and other levels of government with its own transcendent views of how best to regulate a species of conduct with which it has no expertise and over which it has no authority. Such a malleable constitution; such adjudicative power: Caesar Augustus would be envious.

B.

Apart from the damage to legislative judgments and federal-state relations, the majority also expands the Eighth Amendment to a place not heretofore envisioned.

Since the Eighth Amendment does not generally limit which acts can be made criminal, challenges to the substance of criminal law are properly directed through those portions of the Constitution that speak to specific substantive rights, like the freedom of speech. *See Texas v. Johnson*, 491 U.S. 397 (1989); *Brandenburg v. Ohio*, 395 U.S. 444 (1969). The majority shatters this harmony. Its analysis seeks to protect a social group, homeless alcoholics, without reference to the Equal Protection Clause, enshrines alcohol consumption as a protected activity without reference to the Due Process Clause, and adopts a fulsome narrative of police harassment without reference to the Fourth Amendment. At bottom, it creates unprecedented protections for those with "a profound drive or craving to use alcohol" in the least likely of places, the Eighth Amendment, and in a manner that will erode the careful structure of the Constitution. Maj. Op. at 5.

Usually when we speak of particular groups that share particular characteristics, we are assessing an equal protection challenge. The appellants here in fact brought such a challenge. My colleagues in the majority rightly recognize that this claim is barred by precedent. Maj. Op. at 8, n.5. Alcoholics are surely worthy of social care and solicitude, but they, like the homeless, are not a constitutionally protected class. *See Mitchell v. Comm'r of the Soc. Sec. Admin.*, 182 F.3d 272, 274 (4th Cir. 1999) ("Alcoholics are neither a suspect nor a quasi-suspect class for purposes of equal protection analysis."); *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) ("Homeless persons are not

a suspect class."). Nor is consuming alcohol a fundamental constitutional right. *Cf. Saenz v. Roe*, 526 U.S. 489 (1999). The fact that many groups such as the homeless deserve civic charity, compassion, and respect does not mean they possess the immutable characteristics akin to race, gender, ethnicity, and the like that define a suspect class for equal protection purposes.

This has not stopped the majority, however, from using the Eighth Amendment to carve out heightened protections manifestly unavailable under the Equal Protection Clause. *See* Maj. Op. at 36-37. At bottom, this bald circumvention of settled law amounts to nothing more than a new font of disparate impact liability. The majority overlooks the clear language of the Virginia law—which on its face applies to rich or poor, homeless or homeowner—and instead speculates and invalidates the interdiction statute for falling too harshly on homeless alcoholics. Maj. Op. at 32 (noting that "Virginia's statutory scheme may nominally penalize 'possession' or 'consumption,' . . . [but] effectively targets and punishes Plaintiffs based on their illness"). This whole "targeting" concept is, to understate the matter, breathtaking. All laws have disparate impacts, falling more heavily on some groups than on others. Those impacts do not constitute unconstitutional targeting. The reality of uneven impact is inevitable in law, which, after all, is enacted to address specific social problems. Disparate impacts normally present no defect under the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229 (1976). But after today's holding, many laws, both civil and criminal, will be vulnerable on an Eighth Amendment disparate impact theory.

This case is about a group, interdicted persons, that is not a protected class under the Equal Protection Clause. It is about an activity, consuming alcohol, that is not a fundamental right under the Due Process Clause. It is about police interactions, but no claim was brought under the Fourth Amendment. It seems that the Eighth Amendment is coming into fashion as a means for striking down both civil and criminal laws that display no constitutional defect but merely fail to comport with the majority's sense of optimal public policy. I cannot see how a claim that fails on multiple other grounds, all of which are arguably more applicable to the case at hand, can prevail on this one. The result is that constitutional doctrine will become ever more sprawling, ever more confusing, and judges will seize upon that same confusion to further work their personal will.

IV.

I now turn to the majority's vagueness theory. The majority has adopted an alternative rationale for striking down duly-enacted law, holding that the term "habitual drunkard" in the civil interdiction statute is unconstitutionally vague. It is difficult to know where to begin with such an unprecedented position. First, as a matter of this court's settled procedures, the question should be unreviewable. Second, even if we could reach it, there is no basis whatsoever for invalidating Virginia's law. The interdiction statute is a civil enactment, which exists solely to provide notice of what acts will trigger criminal sanctions. Vagueness doctrine simply has no place in this case, as the appellants themselves recognized before the panel. By nonetheless pushing forward, the majority

66

has launched a new theory of civil vagueness, a doctrine that will most assuredly become a favorite of litigants seeking to invalidate state laws.

## A.

As an initial matter, the majority has no basis for reaching the vagueness challenge. The appellants, who were ably represented throughout this litigation, stated twice before the panel that they were not raising the issue. Accordingly, the panel did not consider it, and neither should the en banc court.

We do not have here a simple failure to press a claim. The appellants instead expressly waived any appeal on their vagueness challenge. *See* Opening Br. at 12, n.8 ("Count Five alleges that the Interdiction Statute as applied to Plaintiffs is unconstitutionally vague in violation of the Fourteenth Amendment. The district court dismissed this count, and Plaintiffs do not press this claim here."); *id.* at 15, n.9 ("The district court additionally rejected Plaintiffs' vagueness claim. As stated above, Plaintiffs do not press this claim here."). Waiver and forfeiture are not the same, and the "intentional relinquishment or abandonment of a known right" has serious consequences. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Accordingly, our circuit has, before today, been especially reluctant to consider waived arguments. *See Porter v. Clarke*, No. 18-6257, at 24 (4th Cir. May 3, 2019) (citing *United States v. Washington*, 743 F.3d 938, 941, n.1

67

(4th Cir. 2014) ("Issues that [the appellant] failed to raise in his opening brief are waived.")).

Since the appellant's vagueness claim was waived, and therefore uncontested, any consideration by the panel would have been an advisory opinion. *See Wood v. Milyard*, 566 U.S. 463, 471, n.5 (2012). As such, the panel did not *sua sponte* resurrect it. The majority's decision to nonetheless take up the vagueness claim en banc significantly degrades the place of panel process in federal appellate review. Of course en banc proceedings have their necessary place, but a panel of three remains our basic unit of decision, three being a more efficient and more collaborative number than a conclave of fifteen.

The majority has provided no standard under which an en banc court can resolve a claim affirmatively waived before a panel, other than "whenever it suits us." This open-endedness is said to be needed "to promote the ends of justice," Maj. Op. at 9 (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)). But the orderly progression of litigation provided by process and the ends of justice are not dichotomous, but complementary, as the neutrality of procedure protects litigants of all persuasions against arbitrary courts and ambush by adversaries. The Federal Rules of Appellate Procedure rightly and properly contemplate en banc proceedings for cases of "exceptional" importance. Fed. R. App. P. 35. They do not contemplate them as the setting for "exceptional" procedural departures. It is not unfair to ask the majority to estimate the costs of allowing procedure to turn this flabby, but the majority has not so much as acknowledged the damage to panel deliberations it has wrought.

The majority contends that our recent decision in *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019), provides some license for its procedural departure. The differences between that case and the decision reached today ought to be obvious. In *Simms*, the government changed its views in response to intervening Supreme Court precedent and both parties argued the issue fully to the en banc court. In this case, the plaintiffs chose to abandon a weak claim on appeal and deliberately refrained from pressing that claim when seeking en banc review. When the issue did emerge during en banc argument, the state was afforded a limited opportunity through supplemental briefing to respond, without the benefit of any panel decision or adequate airing.

By reviving the vagueness claim now, we are inviting litigants to take this court for a ride. We should not, for want of a better word, be such chumps. Future litigants will rely on this case endlessly to excuse inexcusable carelessness, or worse, calculated litigation strategy that in hindsight proved unsuccessful.

B.

The civil vagueness claim also fails on its merits. "The essential purpose of the 'void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct." *Jordan v. De George*, 341 U.S. 223, 230 (1951). *See Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("All are entitled to be informed as to what the State commands or forbids."). Fair notice both informs the public and constrains law enforcement. Vagueness doctrine protects a person's right to be convicted only under laws that speak with some clarity.

It ought to be obvious that a statute whose sole purpose is to provide notice does not transgress this constitutional limit. Once again, Virginia's interdiction law has two parts: one civil and one criminal. Under the scheme, a person can be convicted of a crime only after an interdiction hearing, which itself requires "due notice" and a determination by a neutral magistrate. *See* Va. Code Ann. § 4.1-333. The interdiction itself does not carry criminal consequences. There is no question that the subsequent prohibitions on consuming and possessing alcohol are not vague, and the majority has not argued that they are. Moreover, an interdicted person may never face criminal punishment at all, either because he refrains from drinking or has his interdiction cancelled. *Id.*

At bottom then, Virginia's statute works to address the very concerns that motivate vagueness doctrine in the first place. The two-step structure puts high-risk persons *on notice* of precisely what sort of acts will subject them to criminal sanctions and places the initial interdiction decision in the hands of a court, rather than law enforcement. The majority collapses these two steps into one for much of its analysis, but somehow still fails to appreciate that it is the statute's prophylactic structure that provides notice before imposing criminal consequences. Put simply, this statute presents no problem that vagueness doctrine could possibly solve.

The majority, however, is undeterred. According to my colleagues, the term "habitual drunkard," which appears only in the civil interdiction statute, is unconstitutionally vague. This position suffers from two infirmities. First, the term is simply not vague under any conceivable standard, as other courts have found. *See Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1047 (9th Cir. 2017) (en banc) ("[T]he term

70

'habitual drunkard' readily lends itself to an objective factual inquiry."). "Many perfectly constitutional statutes use imprecise terms." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 (2018). The Supreme Court has found that open-ended phrases, like "crime involving moral turpitude," *Jordan*, 341 U.S. at 232, pose no difficulty, even under the most rigorous scrutiny. In its most recent vagueness decisions, *Dimaya* and *Johnson*, the Court noted that the imprecise statutory terms "serious potential risk" or "substantial risk" were not unconstitutional on their own. *See Dimaya*, 138 S. Ct. at 1213; *Johnson v. United States*, 135 S. Ct. 2551, 2557-58 (2015). The vagueness challenge in those cases only succeeded because of the specific problem that arose from assessing an earlier criminal offense, a problem that is obviously not implicated here.

Each of the above phrases were far less precise than the Virginia statute. "Habitual drunkard," by its own language, requires both a pattern of behavior and a certain form of conduct, both of which are familiar to the law. *See Drunkard*, Black's Law Dictionary (10th ed. 2014) ("Someone who habitually consumes intoxicating substances excessively."). The majority finds fault with Virginia's statute on the grounds that Webster's International Dictionary (3d ed. 2002) provides multiple definitions for the word "habit." Maj. Op. at 15. If multiple dictionary definitions of a word are the new standard for toppling state statutes, few such civil enactments will be left standing. The majority prefers to treat "habit" as a noun in isolation, rather than a modifier for the noun that follows. But whatever form of the word is used, discerning its common meaning is really not all that hard. As the majority well knows, "habit" means doing something over

and over, in this case consuming alcohol to excess. Habits are something that all of us have as we go about our personal lives; none of us can fail to miss a habit's meaning.

By identifying specific and repeated conduct, the statute is nothing like those laws that have been found unconstitutionally vague in the past, such as those that proscribed passive acts like "loitering," *see Papachristou*, 405 U.S. at 160, or targeted "improper persons," *see Booth v. Commonwealth*, 88 S.E.2d 916, 918 (Va. 1955), without any conduct at all. To fall within the interdiction statute, moreover, a person must affirmatively "show[] himself to be" a habitual drunkard. *See* Va. Code Ann. § 4.1-333. It is simply not a statute that can sweep up the unwitting passerby.

Were the text of the law not clear enough, the Virginia courts have provided even greater precision, holding that the term "habitual drunkard encompasses one who . . . is admittedly in the continual habit of being intoxicated from alcohol." *See Jackson v. Commonwealth*, 604 S.E.2d 122, 125 (Va. Ct. App. 2004) (quoting *Fisher v. Coleman*, 486 F. Supp. 311, 315 (W.D. Va. 1979)). While other courts have used slight variations on this definition, each of them has been driving at the same basic conduct: a repeated course of consuming alcohol to excess, excess being the impairment of judgment, the loss of motor function, the lessening of impulse control, and other commonly recognized effects. These interpretations, just like the statute's plain text, clearly put citizens and officers on notice of the statute's limited reach.

In sum, the majority would outlaw "general definition[s]" and terms from many state enactments. *See* Maj. Op. at 17. It apparently believes that its semantic hair-splitting of the terms "habitual" and "drunkard" passes for some sort of textualism. It is the very

opposite of textualism. Properly understood, textualism seeks to apply the lawmaker's words to a particular case, thereby respecting the lawmaker's intent. The whole point of the majority's faux textualism is not to respect the lawmaker's intent but to undermine it, and in doing so to aggrandize the power of the judiciary vis-à-vis the legislative branch by picking critically and ceaselessly at enacted words. Only an approach as ad hoc and pliable as the majority's could lead to the conclusion that "drunkard" is vague while "intoxicated" is not. Maj. Op. at 17-18. Yet that is where we are. An analogy to this sort of indiscriminate picking at verbiage took place with respect to jury instructions until the Supreme Court brought it up short. *See Henderson v. Kibbe*, 431 U.S. 145 (1977). The approach to vagueness adopted by the majority transparently incentivizes the semantic destruction of many kinds of statutes of whose purpose a court does not approve.

C.

The majority's extended discussion of civil vagueness shows no differentiation at all in the notice required or standards applied to civil and criminal enactments. *See* Maj. Op. at 15. The majority casually applies its pick to a civil law, showing an utter indifference to the consequences of its novel venture. The Supreme Court has spoken of vagueness in explicitly criminal terms for decades. *See, e.g.*, *Johnson*, 135 S. Ct. at 2557 ("[Vagueness] principles apply not only to statutes defining elements of a crime, but also to statutes fixing sentences."); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). *See also Papachristou*, 405 U.S. at 162. The criminal nature of the doctrine is so prevalent that there was recently some debate about whether there could even be a proper standard for "civil vagueness." Transcript of Oral Argument at 39-41, *Dimaya*, 138 S. Ct. 1204. One

73

need not have a view on that question to recognize that civil statutes are certainly not held to the same standard as criminal ones, a proposition richly supported in the U.S. Reports. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *Jordan*, 341 U.S. at 231 (applying the criminal vagueness standard because of the "grave nature of deportation"); *Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement.").

The majority leaps casually from criminal to civil vagueness, not disputing that an interdiction order alone carries no criminal penalty whatsoever or seriously contending that an inability to drink alcohol is comparable to other serious consequences like deportation. Nonetheless, the majority charges forward and finds the purely civil part of the Virginia law warrants the most exacting scrutiny. *See* Maj. Op. at 12-13. The consequences of such a venture are boundless. Many civil statutes make use of imprecise phrases. Virginia, like all other states, attaches civil liability to broad concepts like "a public or common nuisance," Va. Code Ann. § 48-1, or "reasonable care." *RGR, LLC v. Settle*, 764 S.E.2d 8, 22 (Va. 2014). Federal civil laws are often just as open-ended. A person can be subjected to civil fines for "deceptive acts or practices" affecting consumers, Federal Trade Commission Act, 15 U.S.C. § 45, or may be liable in a public or private suit for "material misstatement[s] and omission[s]" involving securities. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). A company's

product can be banned by the Consumer Product Safety Commission if it "presents an unreasonable risk of injury" to consumers. 15 U.S.C. § 2057. If civil vagueness were to prevail, all these previously uncontroversial statutes and many more would suddenly be placed in doubt. *See* Transcript of Oral Argument at 35-36, *Dimaya*, 138 S. Ct. 1204 ("We might do a wonderful job of pruning the United States Code if we said that every civil statute that is not written with the specificity that is required by criminal statute is unconstitutionally vague." (Statement of Alito, J.)).

The majority tries to evade the implications of its civil vagueness theory by pointing to "the integrated structure of the challenged scheme," arguing that Virginia's prophylactic approach justifies a "relatively strict test for vagueness." Maj. Op. at 12-13. My colleagues cannot have it both ways. Either what matters here are the civil consequences of an interdiction order, in which case the strict standard is inapplicable, or what matters are the criminal consequences that can befall interdicted persons for subsequent acts, in which case prior notice and a determination by a neutral magistrate are an integral part of the scheme. The inconsistency of the majority's view is the inevitable result of stretching vagueness doctrine to meet its preferences, without any regard to the vital purpose that doctrine serves in our constitutional law.

As if this novel view of civil vagueness were not enough, the majority takes it one step further by tearing up state law, striking yet another blow to the state's rightful place in our federal system. On the majority's theory, states would be prevented from using a civil designation to ward off future criminal acts, lest the entire scheme be attacked as "quasi-criminal." Maj. Op. at 13. There is no doubt that Virginia, as part of its efforts to

prevent alcohol-related violence, could impose increasingly severe sentences for each act of public intoxication or disorderly conduct. Instead, Virginia has opted for a less draconian approach, which uses a pattern of violations to put someone on notice, by civil means, of future acts that will lead to criminal punishment. Faced with the majority's vagueness theory, however, it is easy to imagine the Commonwealth looking to other familiar means of deterring repeat offenders that would cause far more heartburn than its present scheme.

The majority's civil vagueness holding shares with its Eighth Amendment holding the same disregard for Supreme Court precedent, the same unwillingness to confront obvious implications, and the same failure to provide any workable limits. In the end, the only thing that ought to be void for vagueness here is the majority opinion, which gives the district court no guidance on remand. It tells everyone what is wrong, and no one what might be right. What it has created is a confusion which promotes judicial ascendency by inviting litigants to trek again to Delphi for yet another inscrutable judicial decree.

V.

It is hard to imagine a decision so infused with ruinous consequences or so insensitive to a judge's inability to rework society from the bench. First, the desire to remove unspecified acts from the purview of criminal law flies in the face of the distinct and emphatic language of the *Robinson* opinion, which indicates that individual actions, as opposed to personal status, remain fair subjects for the legislative contemplation of

76

criminal sanctions. Not only are the words of the Supreme Court disregarded, but so too is the settled legal landscape that for more than half a century has reinforced their relevance. The clear and principled status-act distinction is now replaced with a nebulous "nonvolitional conduct" defense, a phrase that will surely metastasize and absolve individuals from personal responsibility for all forms and manners of criminal acts.

This decision is an affront to our legal traditions. It leaves states less able to enact prophylactic civil laws and sanctions in order to forestall more serious crimes. It usurps the American Constitution in order to cement the states as subordinate entities in our federal structure, a result profoundly at odds with the vibrant federalism that was intended to define not only our young but our maturing Republic. What's more, the majority adopts the Eighth Amendment as its amendment du jour, pushing it into a supervisory role over substantive criminal law and into territory heretofore inhabited by other constitutional provisions.

Finally, the majority has, without even bothering to follow this court's basic procedures, adopted a novel theory of civil vagueness, one that calls into question countless expressions in numerous civil laws. The effects of this position will long be felt, as all manner of words and phrases will be impugned for their alleged imprecision.

It is not often that a decision operates to visit structural and institutional damage in so many respects. Any one of these flaws would be serious. Altogether, they are more than severe. I only wish that my colleagues, in their rush to condemn Virginia for a policy they don't prefer, stopped to consider that perhaps this law has endured for the benefit of the many victims of alcohol-fueled violence; victims who cannot easily make their voices

77

heard, and who are all too often neglected in decisions like the one reached here. One may always hope, however. All pretensions to restraint have been abandoned. But may the first rays of sunrise light the return of the many clear principles that have so eluded the majority along the way.

WILKINSON, Circuit Judge, dissenting specially:

I thank Judge Keenan for her concurring opinion. With all respect, the doctrinal march of the majority opinion is indeed "an assault upon the constitutional, democratic, and common law foundations of American civil and criminal law." *See* Conc. Op. at 38. A decision impairing the ability of states to regulate purportedly nonvolitional conduct and alcohol under the authority of the Twenty-first Amendment absolutely carries somber implications for the abuse of women both on campus and in the home. *See* Diss. Op. at 52-55. An en banc case with two novel and troubling constitutional holdings is hardly the unremarkable matter the concurrence seeks to portray.

I shall not repeat the arguments in the principal dissenting opinion other than to say that the very purpose of a dissenting opinion is to illuminate difference, not to evidence disrespect. To my mind, mutual respect and collegiality are enhanced, not compromised, by a vigorous exchange of views over basic and fundamental principles of law. A robust exchange reveals judges who care, not out of self-interest, but about the lives of the litigants before them and, in a larger sense, about the capacity of law to bring great benefit to society or to inflict significant harm. That we discharge our oath of office with conviction and at times with passion is something I believe the public and the profession will respect. What I hope makes the judicial process unique is that the clash of views plays out under a transcendent canopy of mutual regard and affection. And so it is here.

My concurring colleagues suggest I have attributed to them "malfeasance." Conc. Op. at 38. Of course I have done no such thing. Being wrong, even woefully wrong, is in

no way malfeasance. I am reminded of the words of Justice Douglas that "[s]peech is often provocative and challenging" and that "a function of free speech under our system of government is to invite dispute." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). In positing that speech "may indeed best serve its high purpose when it . . . stirs people to anger," *id.*, Justice Douglas missed a point rightly grasped by my concurring colleagues—namely that civil discourse is often the best antidote to a coarsening culture. But one need not subscribe wholly to the Justice's full-throated cry in order to recognize that civility, for all its value, may also be used as a censoring mechanism to drain and dilute dissenting voices. Flaws are not always best laid bare by pallid speech. Animation defines the First Amendment I was taught to revere.

I thank the members of the majority not only for the sincere expression of their views but for affording me the opportunity to say that our Circuit is truly fortunate to have the services of such capable and dedicated jurists—and that I have been blessed beyond measure to have them as colleagues and friends.

That having been said, we have in this case a deep and honest difference of opinion the importance of which can neither be brushed off nor wished away. It is after all a dissent to which my colleagues take exception. The very nature of the effort is one of contrast. And so it is here.

DIAZ, Circuit Judge, dissenting:

I agree with the substance of Judge Wilkinson's dissent regarding the merits of this case. I write separately, however, because I think it well within this court's discretion to consider Plaintiffs' vagueness challenge, even as I would reject the challenge on its merits. With respect to Plaintiffs' Eighth Amendment claim, the majority ventures too far in extending the holding announced in *Robinson v. California*, 370 U.S. 660 (1962), so as to apply to criminal conduct compelled by addiction. Respectfully, that decision is not for us to make.

A.

When a party expressly waives an argument before a panel of this court, we usually decline, as a matter of discretion, to consider the argument on rehearing en banc. But as the majority explains, we may consider an abandoned argument in the rare case where the record enables us to do so, where doing so would not prejudice either party, and where the argument implicates an issue of great importance.

This is such a case, for the reasons described by the majority. The basis for Plaintiffs' vagueness challenge was adequately developed in the district court. We do not prejudice the Commonwealth by considering the challenge now, because it had a full opportunity to address the issue at en banc oral argument and through supplemental briefing. And although I cannot join in the majority's analysis of the vagueness issue, I agree that we should consider it to ensure that we correctly decide a matter of public importance. Enforcement of Virginia's interdiction statute impacts the basic liberty interests of the Plaintiffs and many similarly situated persons throughout the

81

Commonwealth. Whether it does so within constitutional bounds is a question that touches on Eighth Amendment and vagueness concerns, which are closely related and have been applied in tandem in cases addressing similar types of statutes. *See, e.g.*, *Joel v. City of Orlando*, 232 F.3d 1353, 1359–62 (11th Cir. 2000); *Farber v. Rochford*, 407 F. Supp. 529, 533–34 (1975); *City of Chicago v. Youkhana*, 660 N.E.2d 34, 39–42 (Ill. App. Ct. 1995), *aff'd sub nom. City of Chicago v. Morales*, 687 N.E.2d 53 (Ill. 1997), *aff'd* 527 U.S. 41 (1999).

Nonetheless, I part company with my colleagues in the majority on whether Virginia's interdiction statute is void for vagueness. As Judge Wilkinson notes, the law is rife with open-ended terms, from "reasonable doubt" to "moral turpitude." These terms generally don't present constitutional vagueness issues, except where they invite arbitrary or discriminatory enforcement or fail to fairly notify those who are subject to a law of what conduct will constitute a violation. The term "habitual drunkard" used in the interdiction statute does neither.

The distinction between occasional and "habitual" drunkards is a question of degree, and it's true that the line may sometimes blur. It is also true that Virginia's courts haven't provided much guidance beyond that contained in the statutory text. *See Jackson v. Commonwealth*, 604 S.E.2d 122, 125 (Va. Ct. App. 2004) (defining a habitual drunkard as one who "is admittedly in the continual habit of being intoxicated from alcohol" (quoting *Fisher v. Coleman*, 486 F. Supp. 311, 315 (W.D. Va. 1979))). But there can be little doubt as to the basic conduct that would qualify one as a habitual drunkard: repeatedly consuming alcohol to excess. This is enough to satisfy the

82

constitutional vagueness standard. *Accord Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1047 (9th Cir. 2017) (en banc).

B.

Nor does Virginia's interdiction statute run afoul of the Eighth Amendment's bar against cruel and unusual punishment. The core dispute in this case is whether *Robinson* prohibits only the criminalization of status, or also of conduct compelled by status. I am satisfied that *Robinson* is better understood as distinguishing status from conduct, which is the interpretation that most courts have adopted in the decades since *Robinson* was decided.

And despite the majority's suggestion to the contrary, *Powell v. Texas*, 392 U.S. 514 (1968), did not alter *Robinson*'s distinction between status and conduct. Rather, Judge Wilkinson is I think correct in concluding that "the judgment in *Powell* neither extended or contracted *Robinson,* which was left undisturbed."

Plaintiffs' Eighth Amendment claim therefore turns on whether *Robinson* can and should be extended to prohibit statutes that criminalize conduct compelled by addiction. In my view, this question is one to be answered in the first instance by the Supreme Court.

Because the majority holds otherwise, I respectfully dissent.